IN the MATTER OF the FINDING OF CONTEMPT IN:
IN the INTEREST OF D.L.D.:
D.L.D., Appellant,

v.

CIRCUIT COURT FOR CRAWFORD COUNTY, the Hon. Michael
Kirchman, presiding, Respondent.

Supreme Court

*No. 82–263. Argued November 29, 1982.—Decided January 5, 1983.*

(Also reported in 327 N.W.2d 682.)

For the appellant there were briefs and oral argument by *Steven P. Weiss,* assistant state public defender.

For the respondent there was a brief by *Michael P. Erhard, Stephen J. Shimshak* and *Foley & Lardner,* Madison, and oral argument by *Mr. Erhard.*

Amicus curiae brief was filed by *Thomas E. Dixon,* for Youth Policy and Law Center, Inc., Madison.

Amicus curiae brief was filed by *Ross Harry Briggs,* for the National Juvenile Law Center, Inc., St. Louis, Missouri, and for Wisconsin Association for Youth, Wisconsin Association for Runaway Services and National Youth Work Alliance.

STEINMETZ, J.   We have accepted this case on a certification from the court of appeals.

The issue is whether a trial court may order a juvenile incarcerated in a secure detention facility for a status offense[1] in the exercise of its contempt powers under ch. 785, Stats., for violating a juvenile dispositional order.[2]

This case arose from a petition to have D.L.D. declared a *child in need of protection or services* (CHIPS) pursuant to sec. 48.13, Stats.,[3] by the circuit court for Crawford county, the Honorable Michael Kirchman.

[1] A status offense is an act, which if committed by adults, does not constitute a criminal offense, but if committed by juveniles, subjects them to the jurisdiction of a juvenile court.

[2] Under the circumstances of this case, the issue between these parties is moot since D.L.D. has turned 18 and she presumably never was securely confined. Nonetheless, this issue is likely to arise again and should be resolved by the court to avoid further uncertainty. *Fine v. Elections Board,* 95 Wis. 2d 162, 289 N.W.2d 823 (1980).

[3] Sec. 48.13, Stats., provides:

"**48.13 Jurisdiction over children alleged to be in need of protection or services.** The court has exclusive original jurisdiction over a child alleged to be in need of protection or services which can be ordered by the court, and:

On March 19, 1981, an order was entered declaring D.L.D., a sixteen and one-half-year-old youth at that time, to be in need of protection or services. The order placed D.L.D. under the supervision of the Crawford County Department of Human Services. The court further imposed the following conditions of supervision:

"(1) Who is without a parent or guardian;

"(2) Who has been abandoned;

"(3) Who has been the victim of sexual or physical abuse including injury which is self-inflicted or inflicted by another by other than accidental means;

"(4) Whose parent or guardian signs the petition requesting jurisdiction and states that he or she is unable to care for, control or provide necessary special care or special treatment for the child;

"(5) Who has been placed for care or adoption in violation of law;

"(6) Who is habitually truant from school, after evidence is provided by the school attendance officer that the activities under s. 118.16(5) have been completed;

"(7) Who is habitually truant from home and either the child or a parent, guardian or a relative in whose home the child resides signs the petition requesting jurisdiction and attests in court that reconciliation efforts have been attempted and have failed;

"(8) Who is receiving inadequate care during the period of time a parent is missing, incarcerated, hospitalized or institutionalized;

"(9) Who is at least age 12, signs the petition requesting jurisdiction and attests in court that he or she is in need of special care and treatment which the parent, guardian or legal custodian is unwilling to provide;

"(10) Whose parent, guardian or legal custodian neglects, refuses or is unable for reasons other than poverty to provide necessary care, food, clothing, medical or dental care or shelter so as to seriously endanger the physical health of the child;

"(11) Who is suffering emotional damage for which the parent or guardian is unwilling to provide treatment, which is evidenced by one or more of the following characteristics, exhibited to a severe degree: anxiety, depression, withdrawal or outward aggressive behavior; or

"(12) Who, being under 12 years of age, has committed a delinquent act as defined in s. 48.12.

"(13) Who has not been immunized as required by s. 140.05(16) and not exempted under s. 140.05(16)(c)."

(1) Regularly attend school.
(2) Satisfactory grades.
(3) Not to consume any alcoholic beverages.
(4) Not to associate with [MZ] at this time.

On January 8, 1982, a complaint was filed alleging that D.L.D. was not following the conditions of the previous order. The basis for the complaint was that D.L.D. was not attending school regularly, was not receiving satisfactory grades, and was disruptive while at school. The complaint requested that D.L.D. be found in contempt and that remedial and punitive sanctions be imposed.

On January 20, 1982, a hearing was held on the contempt complaint, and D.L.D. was found in contempt of court for violating the conditions concerning school attendance contained in the March 19, 1981, order. The court entered an order finding D.L.D. in contempt and sentenced her to serve 20 days in secure detention. The order provided that D.L.D. could purge the contempt by attending school satisfactorily for the next 30 days, commencing on January 20, 1982.

Appeal was taken from the contempt order by filing a notice of appeal on February 11, 1982. The court of appeals certified the case to this court and we accepted certification.

## I.

In 1977, the legislature made significant revisions in the Children's Code, ch. 48, Stats. One of the policy reforms in the new legislation was the deinstitutionalization of status offenders. This reflected the legislature's judgment that status offense behavior is symptomatic of a youth's needs for protection or services that may have been the result of deficiencies in the child's family or school environment.[4] The legislature realized that most

[4] Barker, G.H. and Adams, W.T. *Comparisons of the Delinquency of Boys and Girls.* 53 Journal of Criminal Law, Criminology, and Police Science 470 (1962).

secure facilities provide no treatment for juveniles and that institutionalization could cause additional psychological and physical harm to the status offenders, since they were often intermingled with juvenile delinquents who had committed serious crimes.[5] To that end, the statute was amended to provide CHIPS with resources which could help resolve the problems which caused the status offense behavior. Sec. 48.345 recites the available remedies in a CHIPS case.

"48.345 **Disposition of child adjudged in need of protection or services.** If the judge finds that the child is in need of protection or services, it shall enter an order deciding one or more of the dispositions of the case as provided in s. 48.34 under a care and treatment plan except that the plan shall not:

"(1) Transfer the custody of the child to the subunit of the department administering corrections;

"(2) Order restitution;

"(3) Order payment of a forfeiture;

"(4) Restrict, suspend or revoke the driving privileges of the child; or

"(5) Place any child not specifically found under chs. 46, 49, 51, 115 and 880 to be developmentally disabled, mentally ill or to have exceptional educational needs in facilities which exclusively treat those categories of children.

"(6) Order the child to participate in a supervised work program under s. 48.34(9)."

Thus, the remaining remedies in sec. 48.34, Stats., which are available in a CHIPS case include:

"48.34 . . . (1) Counsel the child or the parent, guardian or legal custodian.

"(2) Place the child under supervision of an agency, the department if the department approves or a suitable adult, including a friend of the child, under conditions prescribed by the judge including reasonable rules for the child's conduct and the conduct of the child's parent, guardian or legal custodian, designed for the physical, mental and moral well-being and behavior of the child.

---

[5] Sheridan, W., *Juveniles Who Commit Non-Criminal Acts: Why Treat in a Correctional System?* 31 Federal Probation 26 (March, 1967).

"(3) Designate one of the following as the placement for the child:

"(a) The home of a relative of the child.

"(b) A home which need not be licensed if placement is for less than 30 days.

"(c) A foster home licensed under s. 48.62 or a group home licensed under s. 48.625.

"(d) A residential treatment center licensed under s. 48.60.

"(4) If it is shown that the rehabilitation or the treatment and care of the child cannot be accomplished by means of voluntary consent of the parent or guardian, transfer legal custody to:

"(a) A relative of the child;

"(b) A county agency;

"(c) A licensed child welfare agency; or

". . .

"(6) If the child is in need of special treatment and care the judge may order the child's parent, guardian or legal custodian to provide such care. If the parent, guardian or legal custodian fails or is financially unable to provide the care, the judge may order the care provided by an appropriate agency whether or not legal custody has been taken from the parents.

". . .

"(10) SUPERVISED INDEPENDENT LIVING. (a) The judge may order that a child 17 or more years of age be allowed to live independently, either alone or with friends, under such supervision as the judge deems appropriate.

"(b) If the plan for independent living cannot be accomplished with the consent of the parent or guardian, the judge may transfer custody of the child as provided in sub. (4) (a) to (c).

"(c) The judge may order independent living as a dispositional alternative only upon a showing that the child is of sufficient maturity and judgment to live independently and only upon proof of a reasonable plan for supervision by an appropriate person or agency."

The Children's Code also acknowledges that a juvenile court can only adjudge an habitual truant a CHIPS, and not a delinquent. Sec. 48.13 (6), Stats., provides that a

CHIPS may be one "[w]ho is habitually truant from school, after evidence is provided by the school attendance officer that the activities under s. 118.16(5)[6] have been completed." An adjudication of delinquency for a truant is not possible under the code since sec. 48.02(3m) defines "delinquent" as: "a child who is less than 18 years of age and 12 years of age or older who has violated any state or federal criminal law . . . ." Failure to attend school is not a violation of any criminal law; thus, truancy cannot form the basis of a delinquency proceeding.

Regarding the secure detention of juveniles, the Children's Code sanctions the incarceration of delinquents, but only where the youth has committed a crime punishable by six months or more and the child has been found to be a danger to the public and to be in need of restrictive custodial treatment. Sec. 48.34(4m), Stats.[7]

[6] Sec. 118.16(5), Stats., lists four activities school officials must perform to solve a truancy problem:

"(5) Prior to any proceeding being brought against a child under s. 48.13(6) or against the child's parent or guardian under s. 118.15, the school attendance officer shall provide evidence that appropriate school personnel in the school or school district in which the child is enrolled have, within the school year during which the truancy occurred:

"(a) Met with the child's parent or guardian to discuss the child's truancy or have attempted to meet with the child's parent or guardian and been refused.

"(b) Provided an opportunity for educational counseling to the child to determine whether a change in the child's curriculum would resolve the child's truancy and have considered curriculum modifications under s. 118.15(1)(d).

"(c) Evaluated the child to determine whether learning problems may be a cause of the child's truancy and, if so, have taken steps to overcome the learning problems.

"(d) Conducted an evaluation to determine whether social problems may be a cause of the child's truancy and, if so, have taken appropriate action or made appropriate referrals."

[7] Sec. 48.34(4m), Stats., provides:

"(4m) Transfer legal custody to the subunit of the department administering corrections for placement in a secured correctional facility, but only if:

For those juveniles not adjudged delinquents, the code lays out very specific criteria which must be followed before a juvenile is incarcerated. Initially, one of the provisions of sec. 48.205 must be met. That statute provides:

"48.205  **Criteria for holding a child in physical custody.**  (1) A child may be held under s. 48.207, 48.208 or 48.209 if the intake worker determines that there is probable cause to believe the child is within the jurisdiction of the court and:

"(a)  Probable cause exists to believe that if the child is not held he or she will commit injury to the person or property of others or cause injury to himself or herself or be subject to injury by others;

"(b)  Probable cause exists to believe that the parent, guardian or legal custodian of the child or other responsible adult is unavailable, unwilling or unable to provide adequate supervision and care; or

"(c)  Probable cause exists to believe that the child will run away or be taken away so as to be unavailable for proceedings of the court or its officers or proceedings of the department for revocation of aftercare supervision."

Then, the specific criteria of sec. 48.208, Stats., must also be satisfied. That statute provides:

"48.208  **Criteria for holding a child in a secure detention facility.**  A child may be held in a secure detention facility if the intake worker determines that one of the following conditions applies:

"(1)  Probable cause exists to believe that the child has committed a delinquent act and either presents a substantial risk of physical harm to another person or a substantial risk of running away as evidenced by a previous act or attempt so as to be unavailable for a court or revocation hearing for children on departmental aftercare. For children on departmental aftercare, the delinquent act referred to in this section may be the act for which the child was committed to a secured correctional facility.

"(a)  The child has been found to be delinquent for the commission of an act which if committed by an adult would be punishable by a sentence of 6 months or more; and

"(b)  The child has been found to be a danger to the public and to be in need of restrictive custodial treatment."

"(2) Probable cause exists to believe that the child is a fugitive from another state or has run away from a secured correctional facility and there has been no reasonable opportunity to return the child.

"(3) The child consents in writing to being held in order to protect him or her from an imminent physical threat from another and such secure custody is ordered by the judge in a protective order.

"(4) Probable cause exists to believe that the child, having been placed in nonsecure custody by an intake worker under s. 48.207 or by the judge or juvenile court commissioner under s. 48.21(4), has run away or committed a delinquent act and no other suitable alternative exists.

"(5) Probable cause exists to believe that the child has been adjudged or alleged to be delinquent and has run away from another county and would run away from nonsecure custody pending his or her return. A child may be held in secure custody under this subsection for no more than 24 hours unless an extension of 24 hours is ordered by the judge for good cause shown. Only one extension may be ordered by the judge."

And, if a jail is to be the place of secure detention, the additional criteria of sec. 48.209, Stats., must be met. That statute provides:

"48.209 **Criteria for holding a child in a county jail.** Subject to the provisions of s. 48.208, a county jail may be used as a secure detention facility if the criteria under either sub. (1) or (2) are met:

"(1) There is no other secure detention facility approved by the department or a county which is available and:

"(a) The jail meets the standards for secure detention facilities established by the department;

"(b) The child is held in a room separated and removed from incarcerated adults;

"(c) The child is not held in a cell designed for the administrative or disciplinary segregation of adults;

"(d) Adequate supervision is provided; and

"(e) The judge reviews the status of the child every 3 days.

"(2) The child presents a substantial risk of physical harm to other persons in the secure detention facility, as evidenced by previous acts or attempts, which can only be avoided by transfer to the jail. The provisions of sub. (1)(a) to (e) shall be met. The child shall be given a hearing and transferred only upon order of the judge.

"(3) The restrictions of this section do not apply to the use of jail for a child waived to adult court."

Moreover, according to sec. 4⌐21(1), Stats.,[8] confinement of non-delinquent juveniles is only a temporary

---

[8] Sec. 48.21(1), Stats., provides:

"48.21 **Hearing for child in custody.** (1) HEARING; WHEN HELD. (a) If a child who has been taken into custody is not released under s. 48.20, a hearing to determine whether the child shall continue to be held in custody under the criteria of ss. 48.205 to 48.209 shall be conducted by the judge or juvenile court commissioner within 24 hours of the time the decision to hold the child was made, excluding Saturdays, Sundays and legal holidays. By the time of the hearing a petition under s. 48.25 shall be filed, except that no petition need be filed where a child is taken into custody under s. 48.19(1)(b) or (d)2, 6 or 7 or where the child is a runaway from another state, in which case a written statement of the reasons for holding a child in custody shall be substituted if the petition is not filed. If no hearing has been held within 24 hours or if no petition or statement has been filed at the time of the hearing, the child shall be released except as provided in par. (b). A parent not present at the hearing shall be granted a rehearing upon request.

"(b) If no petition has been filed by the time of the hearing, a child may be held in custody with approval of the judge or juvenile court commissioner for an additional 48 hours from the time of the hearing only if, as a result of the facts brought forth at the hearing, the judge or juvenile court commissioner determines that probable cause exists to believe that the child is an imminent danger to himself or herself or to others, or that probable cause exists to believe that the parent, guardian or legal custodian of the child or other responsible adult is unwilling or unavailable to provide adequate supervision and care. The extension may be granted only once for any petition. In the event of failure to file a petition within the 48-hour extension period provided for in this paragraph, the judge or juvenile court commissioner shall order the child's immediate release from custody."

remedy prior to the adjudication and entry of an appropiate dispositional order.

From the foregoing, two policy decisions made by the legislature when revising the Children's Code become apparent. First, treatment and services for status offenders are to be emphasized in dispositional orders. And, second, secure detention for juveniles is to be discouraged and is appropriate only in a few limited situations. The question in this case then becomes whether a trial judge can rely on his contempt powers under ch. 785, Stats., and incarcerate a truant, notwithstanding the above legislative policy decisions present in the Children's Code.

## II.

In *In re Hon. Charles E. Kading,* 70 Wis. 2d 508, 543b, *rehearing,* 235 N.W.2d 409, 238 N.W.2d 63, 239 N.W.2d 297 (1975), this court said: "It is settled beyond any question in Wisconsin that all courts have an inherent power to hold in contempt those who disobey the court's lawful orders." The power exists independently of statute because "it is a necessary incident to the exercise of judicial power and is reasonably to be implied from the grant of such power." *Appeal of Cichon,* 227 Wis. 62, 67–68, 278 N.W. 1 (1938).

In addition, Wisconsin courts possess the statutory power of contempt.[9] Sec. 785.01, Stats., recognizes two

---

[9] Secs. 785.01 and 785.02, Stats., provide:

"785.01 **Definitions.** (1) 'Contempt of court' means intentional:

"(a) Misconduct in the presence of the court which interferes with a court proceeding or with the administration of justice, or which impairs the respect due the court;

"(b) Disobedience, resistance or obstruction of the authority, process or order of a court;

"(c) Refusal as a witness to appear, be sworn or answer a question; or

"(d) Refusal to produce a record, document or other object.

types of contempt sanctions. A "punitive sanction" means a sanction imposed to punish a past contempt of court for the purpose of upholding the authority of the court. Sec. 785.01(2). A "remedial sanction" means a sanction imposed for the purpose of terminating a continuing contempt of court. Sec. 785.01(3). Traditionally, a punitive sanction was imposed for criminal contempt and a remedial sanction for civil contempt. The distinction between the purposes of the contempt is retained in the current statute without the criminal and civil contempt designations.

The contempt order here appears to have both a remedial purpose and a punitive purpose. The contempt order was entered partially to uphold the court's authority, but at the same time, the order was remedial in that its purpose was to coerce D.L.D. into complying with the court's order. We hold the primary purpose of the contempt order was to force D.L.D. to attend school. The goal of a juvenile court judge is a protective one, not a punitive one. While we recognize that compliance

---

"(2) 'Punitive sanction' means a sanction imposed to punish a past contempt of court for the purpose of upholding the authority of the court.

"(3) 'Remedial sanction' means a sanction imposed for the purpose of terminating a continuing contempt of court."

"785.02 **Power of court to punish for contempt of court.** A court of record may impose a remedial or punitive sanction for contempt of court under this chapter."

The statutory law of contempt of court in Wisconsin has recently undergone reform. Prior to 1979, there was much confusion regarding the statutes regulating a court's contempt power. This confusion was based largely on the continued maintenance of the historical distinction between criminal and civil contempt. *State v. King,* 82 Wis. 2d 124, 262 N.W.2d 80 (1979); Comment, *Contempt of Court: Some Considerations for Reform,* 1975 Wis. L. Rev. 1117. This distinction was removed by virtue of ch. 257, Laws of 1979, which is now contained in ch. 785, Stats.

with the order does vindicate the court's authority, this effect is only secondary.

A court's contempt power is not absolute. In discussing the power, we stated in *State v. King*, 82 Wis. 2d 124, 136, 262 N.W.2d 80 (1978):

"However, this court has just as consistently held that this power is subject to reasonable legislative regulation:

"'Doubtless, this power may be regulated, and the manner of its exercise prescribed, by statute, but certainly it cannot be entirely taken away, nor can its efficiency be so impaired or abridged as to leave the court without power to compel the due respect and obedience which is essential to preserve its character as a judicial tribunal.' *State ex rel. Attorney General v. Circuit Court for Eau Claire County*, 97 Wis. 1, 8, 72 N.W. 193 (1897). *See also, Upper Lakes Shipping v. Seafarers I. Union*, 22 Wis. 2d 7, 17, 125 N.W.2d 324 (1963)."

Ch. 48, Stats., does not speak directly to the contempt power of a court when dealing with juvenile contemnors. However, there is no indication in the Children's Code or the contempt statute that courts with juvenile jurisdiction have different contempt powers than other courts. It has been stated that: "Juvenile courts generally have the same power as other courts to punish for contempt." 47 Am. Jur. 2d *Juvenile Courts*, sec. 5 (1969).

Where a court is granted jurisdiction over subject matters, it is implicit in that grant of jurisdiction that a court can use the contempt power to effectively carry out the functions ordered by the legislature. Prior to the revision of the Children's Code, a special study committee appointed by the governor undertook a thorough investigation of Wisconsin's juvenile justice system in 1975. The committee developed standards and goals which were adopted with minor modifications by the Wisconsin Council on Criminal Justice (WCCJ). The WCCJ report provided much of the foundation and im-

petus for the 1977 revision of the Children's Code. One of the goals identified by the report was the removal of all status offenses from the juvenile court system. The WCCJ report stated:

"Juvenile courts should not be burdened with the role of child welfare agency or with the rehabilitation of children who run away, smoke, refuse to attend school, associate with undesirables, or are otherwise incorrigible. [Citation omitted.] If a juvenile is beyond the control of his/her parents, a court order to behave, with a threat of increased judicial intervention, is not much more than an exercise in futility. Similarly, if a juvenile is truant or uncontrollable in a school setting, a court order mandating that the juvenile return to school is equally ineffective." *Juvenile Justice Standards and Goals: Special Study Committee on Criminal Justice Standards and Goals, Final Report, Wisconsin Council on Criminal Justice* (December, 1975) at 18.

The legislature rejected this recommendation and kept status offenders in the juvenile court system in the form of CHIPS. Once jurisdiction has been granted to a court, it must have the requisite power to enforce its orders. Indeed, it is the court's duty to insure that its orders are obeyed by invoking the appropriate remedial sanctions.

We believe that missing school as the occasion for ch. 48, Stats., jurisdiction cannot be equated legally or factually with missing school in willful and contumacious defiance of a court order. Therefore, the remedies available pursuant to a CHIPS dispositional order are distinguishable from the remedies available to enforce that order.

One court faced with this issue observed:

"The Legislature has determined that [status offenders] shall not be detained in or committed to secure institutions even if this makes juvenile court judges look ridiculous. . . . It is simply not fair to a juvenile court judge to whom the community looks for help to so restrict him that he cannot put his orders or decisions into effect.

Certainly, not all [status offenders] need to be placed in secure facilities. However, some do and in these cases the juvenile court judge must have the authority to detain in a secure facility—if [status offenders] are to remain in the juvenile court." *In Re Ronald S.*, 69 Cal App 3d 866, 873–75, 138 Cal. Rptr. 387, 392–93 (Cal. Ct. App. 1977).

Courts may not be placed in a situation where authority is lacking to enforce their orders.

This court recognizes that the power of contempt is an extraordinary one that should be used sparingly and with the utmost sensitivity. This caveat is especially true since the 1977 revisions to the Children's Code adopted the general policy of deinstitutionalizing status offenders. Accordingly, we determine that a status offender may be found in contempt and incarcerated, but with the following limitations: (1) the juvenile is given sufficient notice to comply with the order and understands its provisions; (2) the violation of the court order is egregious; (3) less restrictive alternatives were considered and found to be ineffective; and (4) special confinement conditions are arranged consistent with sec. 48.209, Stats.

The attorney general of Wisconsin has issued an opinion on the precise issue before the court. The opinion concluded:

"[W]hile courts in this state have the authority to find juveniles in contempt of court, the sanctions of imprisonment provided for in sec. 785.04(1)(b) and (2), Stats., should be imposed only under the criteria contained in secs. 48.205 and 48.208, Stats., or in situations where the act of contempt is egregious and the imposition of less restrictive sanctions have already failed or would fail. It would be my further conclusion, based upon the foregoing, that courts may not order the imprisonment of juveniles as a disposition in a juvenile proceeding under the guise of exercise of its powers of contempt. For example, it would be my conclusion that a court could not

imprison a juvenile under the guise of its contempt powers for being habitually truant from school unless the criteria set forth in sec. 48.208, Stats., are present, that is, the courts cannot substitute imprisonment for contempt for appropriate dispositional orders covering status offenses under ch. 48, Stats." 70 Op. Atty. Gen. 98, 107–08 (1981).

An attorney general's opinion is entitled to whatever persuasive value it may have. *Wood County v. Bd. of Vocational, T. & A. Ed.,* 60 Wis. 2d 606, 613, 211 N.W.2d 617 (1973). We agree that in situations where the contemptuous act is egregious and the imposition of less restrictive sanctions has already failed or would fail, incarceration of a juvenile is permissible. We disagree with the proposition that this standard is not applicable to status offenders and that they can never be confined.

Other states which have dealt with this issue have agreed with our result. The Supreme Court of Minnesota held:

"[O]nly under the most egregious circumstances should the juvenile courts exercise their contempt power in such a manner that a status offender will be incarcerated in a secure facility. If such action is necessary, the record must show that all less restrictive alternatives have failed in the past." *State ex rel. L.E.A. v. Hammergren,* 294 N.W.2d 705, 707 (Minn 1980).

Similarly, a court of appeals in Washington held:

"There is no indication, however, that the legislature intended to restrict the statutory contempt power of juvenile court judges, nor would any attempt to restrict the statutory contempt power affect the court's inherent contempt power to enforce its orders. . . . It should be noted that the contempt power is to be exercised with caution, and within narrow limits. Only under the most egregious circumstances should the juvenile court exercise its contempt power to incarcerate a status offender in a secure facility. If such action is necessary, the record should demonstrate that all less restrictive alternatives

have failed." *State v. Norlund*, 31 Wash. App. 725, 644 P.2d 724, 726–27 (1982).

We recognize that other states have held otherwise. *See e.g., In Re Ronald S.*, 69 Cal. App. 3d 866, 138 Cal. Rptr 387 (Cal. Ct. App. 1977); *In Interest of Tasseing H.*, 281 Pa Super 400, 422 A.2d 530 (1980); *W.M. v. State*, 437 N.E.2d 1028 (Ind. App. 1982). However, the decisions are distinguishable from our case. In the above-cited cases, the courts disapproved of adjudicating a child a delinquent on the basis of a contempt finding and then using the delinquency status as justification for the secure detention. The courts thought this practice to be bootstrapping since the juvenile was ultimately adjudged a delinquent for committing only a status offense. There was never an attempt in this case to adjudge D.L.D. a delinquent on the basis of her contemptuous acts.

### III.

We now must examine the record to determine whether the contempt order was lawful under the circumstances. Initially, we note the record fails to reflect any attempt to resolve D.L.D.'s truancy difficulties through the express statutory provisions of sec. 118.16(5), Stats., or that the court considered these requirements in determining whether D.L.D. was in need of protection or services of the court. The lower court should have considered such evidence prior to adjudging D.L.D. a CHIPS and during the contempt proceedings.

Little evidence was adduced at the contempt hearing regarding the availability of alternative dispositions. There was testimony by D.L.D.'s social worker that placing D.L.D. in another household was inappropriate. The social worker also testified about the alternatives of vocational school and full-time employment as follows:

"*Q.* [Court]: Have you investigated possibilities with [D.L.D.] and others attendance at a vocational school or full time employment?

"*A.* I have told [D.L.D.] that if she wished to speak to me about those things that I would be more than happy to explore those things with her. However, she's never approached me on that."

This exchange evidenced a misunderstanding as to a party's responsibility for action required by the statute. It was for the expert, the social worker, to suggest available and appropriate alternatives, and not merely to approve or carry through on a juvenile's suggestions. It was D.L.D.'s immaturity that had partly caused the problems and she should not have been relied on for mature suggestions. While sec. 118.15(1)(b), Stats.,[10] indicates that vocational training requests are to come from the child, it is only reasonable to believe that the social worker should place it before the child as an available alternative.

[10] Sec. 118.15(1)(b), Stats., provides:

"118.15 **Compulsory school attendance.** (1)(a) Except as provided under pars. (b) and (c), unless the child is excused under sub. (3) or (4) or has graduated from high school, any person having under control a child who is between the ages of 6 and 18 years shall cause the child to attend school regularly during the full period and hours, religious holidays excepted, that the public or private school in which the child should be enrolled is in session until the end of the school term, quarter or semester of the school year in which the child becomes 18 years of age.

"(b) Upon the child's request of the school board and with the written approval of the child's parent or guardian, any child who is 16 years of age or over may attend, in lieu of high school or on a part-time basis, a vocational, technical and adult education school. Where such a request is made and approved by the school board, the district board of the vocational, technical and adult education district in which the child resides must admit the child and must enter into the contract specified in sub. (2). Every district board must offer day class programs satisfactory to meet the requirements of this paragraph and sub. (2) as a condition to the receipt of any state aid."

The record also demonstrates that excuse from school attendance under sec. 118.15(1)(c), Stats.,[11] was inadequately considered. D.L.D. had earlier made that request to the judge but told him she had no idea what she would do if excused. Again, while this relief is premised on the child's request, the court should have ordered a more detailed investigation of this alternative.

Moreover, the record shows that the contempt action was based solely on the finding that D.L.D. regularly missed classes. The trial court's limited consideration of alternative arrangements came only during the dispositional stage of the contempt hearing, i.e., after D.L.D. was already found in contempt. The consideration of alternative dispositions should have been made prior to any contempt finding. The court must make findings that alternative dispositions are ineffective before exercising its contempt power.

In conclusion, we find that D.L.D. was improperly held in contempt of court, since the trial court did not sufficiently consider less restrictive alternative dispositions.[12] A judge must specifically consider all of the

[11] Sec. 118.15(1)(c), Stats., provides:

"118.15 **Compulsory school attendance.** . . . (c) Upon the child's request and with the written approval of the child's parent or guardian, any child who is 16 years of age or over shall be excused by the school board from school attendance. A child who is excused from school attendance under this paragraph shall be informed by the school board of his or her right to be readmitted to school upon request. The school board may specify when the child will be excused or readmitted after being excused from school attendance."

[12] There is no issue in this case regarding proper notice to D.L.D. regarding the court order. Judge Kirchman made it clear to D.L.D. what she was ordered to do and the consequences that would result if she failed to obey the order. D.L.D. stated on the record that she understood the provisions of the order. We do not reach nor do we decide the issue of whether D.L.D.'s violation of the dispositional order was egregious.

dispositional remedies under sec. 48.345, Stats., and other alternatives that may be appropriate before holding a child in contempt. The judge obviously, with the others involved, felt frustrated that an intelligent and able seventeen and one-half year old child at the time of the contempt finding, was not attending school. Nonetheless, there were alternatives that had to be exhausted before the power of society expressed in the judge's contempt authority could be exercised to bend the will of immaturity by a threat of confinement. We sympathize with the well-intentioned efforts of the trial court.[13] But given the severe nature of the contempt power, we feel it necessary to require a complete exhaustion of alternatives with findings concerning each remedy's relevancy and effectiveness.

In summary, this court holds that a CHIPS may be found in contempt and incarcerated only when the following conditions are met:

(1) The juvenile was given sufficient notice to comply with the order and understands its provisions.

(2) The violation of the court order is egregious.

(3) Less restrictive alternatives were considered and found to be ineffective; and

(4) Special confinement conditions are arranged consistent with sec. 48.209, Stats.

---

[13] Judge Kirchman's sincerity in helping D.L.D. is evidenced by the following quote from the contempt hearing:

"Now, I'm aware there's a good number and increasing number of juveniles her age who are dropping out of school and many courts give up, throw their hands up and say, let them go their own way, let them stay out all night, whatever they want. They'll have to learn their own lesson or fend for themselves. I think that the court has an obligation to intervene and to assist the parents in bringing up their child and in helping them to control that child so that the child can be brought up to the standards I guess that our society sets and that they can obtain the skills that are needed in our modern society."

The court believes this standard is a reasonable one which recognizes the legislative policy of discouraging the incarceration of status offenders and still allows courts sufficient authority to enforce their orders.

*By the Court.*—The order of the circuit court for Crawford County is reversed.