[S.F. No. 24917. Jan. 25, 1988.]

In re MICHAEL G., a Minor, on Habeas Corpus.

MICHAEL G., Petitioner, v.
THE SUPERIOR COURT OF FRESNO COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

COUNSEL

Edward Sarkisian, Jr., Public Defender, and Jose Villarreal, Deputy Public Defender, for Petitioner.

Wilbur F. Littlefield, Public Defender (Los Angeles), Alan H. Simon, Albert J. Menaster and Susan L. Burrell, Deputy Public Defenders, as Amici Curiae on behalf of Petitioner.

No appearance for Respondent Court.

Edward W. Hunt, District Attorney, and Kenneth Hahus, Deputy District Attorney, for Respondent and for Real Party in Interest.

Christopher N. Heard, George Nicholson and Myron Moskovitz as Amici Curiae on behalf of Respondent and Real Party in Interest.

## OPINION

ARGUELLES, J.— ■■ In this case we decide whether a minor made a ward of the court pursuant to Welfare and Institutions Code section 601, subdivision (b)[1] as a result of his truancy, and later found in contempt of court for wilfully disobeying a juvenile court order to attend school, may be punished with confinement in a secure facility during nonschool hours, or whether sections 601, subdivision (b) and 207 prohibit such a disposition. ■■ Like the majority of other state courts which have addressed similar statutory schemes, we conclude that a juvenile court retains the authority, pursuant to its contempt power, to order the secure, nonschool-hours confinement of a contemptuous section 601 ward. ■■■ ■■■ At the same time, in order to harmonize the juvenile court's exercise of its contempt power with the legislative determination that status offenders, including truants,[2] should not ordinarily be confined in secure facilities, we conclude—again following the lead of a number of out-of-state decisions—that before a juvenile court orders such incarceration pursuant to its contempt authority, it should make a number of specified findings establishing the necessity of such a course of action.

### FACTS

Petitioner Michael G., a minor, was adjudged a ward of the Fresno County Superior Court, Juvenile Division, pursuant to section 601,

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

[2] "The status offender is a statutory creation, who occupies a unique position in the juvenile justice system. In contrast to the neglected, dependent or abused child, the status offender comes within the jurisdiction of the juvenile court because of his or her behavior, rather than on a finding of improper parental care or guidance. Unlike children charged with or found guilty of delinquency, alleged or adjudicated status offenders have not committed acts which would be considered criminal if done by an adult. When status offenders are incarcerated, therefore, it is not for any violation of the penal code, but for behavior which is considered unacceptable solely because of their age." (Costello & Worthington, *Incarcerating Status Offenders: Attempts to Circumvent the Juvenile Justice and Delinquency Prevention Act* (1981) 16 Harv. C.R.-C.L. L. Rev. 41, 42 [hereinafter cited as *Costello & Worthington*].) In California, juvenile court jurisdiction over status offenders is conferred by section 601. This opinion will use the terms "status offender" and "section 601 ward" interchangeably.

subdivision (b)—truancy. As a condition of probation he was ordered, inter alia, to "attend school regularly and not be tardy or absent." Following numerous unexcused absences from school, the court ordered petitioner to show cause why he should not be held in contempt of court. A demurrer and alternative motion to dismiss the order to show cause were filed in which petitioner acknowledged receiving a copy of the probationary order and that "he was able to comply with each order and failed to comply with such orders."

Hearings were held on November 26 and December 3, 1984, after which the juvenile court concluded petitioner wilfully disobeyed the order of the court to attend school regularly and not be tardy or absent. Rejecting petitioner's demurrer and alternative motion to dismiss, the court ordered petitioner be delivered to the custody of the Director of Institutions of the Fresno County Probation Department for confinement for a 48-hour period. The court also ordered petitioner be held out of sight and hearing of any section 602 wards and that the 48-hour period would commence on Friday at 6 p.m., and end at 6 p.m., the following Sunday.

However, the juvenile court thereafter ordered petitioner to deliver himself into custody some 11 days hence "[t]o afford the minor the opportunity to ask review by the appellate court." Indeed, the juvenile court "earnestly" asked petitioner's counsel to seek writ review, stating: "[a]nd if it is determined that contempt proceedings or sanctions cannot be imposed against a Section 601(b) ward and that the Court cannot enforce its orders, then I certainly think that it's high time that the Court got out of the truancy business, [and] the [L]egislature place the Court in the position where it will have some dignity again. Certainly nothing is to be gained by the courts sitting here and pronouncing meaningless orders." The matter was later stayed by the Court of Appeal for the Fifth Appellate District but upon reflection, that court vacated the stay and denied a petition for a writ of habeas corpus and/or prohibition. We then granted review.

### DISCUSSION

In finding petitioner in contempt for violating a valid court order, the juvenile court exercised the traditional power inherent in judicial officials. ■■ ■■■ "We start with the premise that the right of courts to conduct their business in an untrammeled way lies at the foundation of our system of government and that courts necessarily must possess the means of punishing for contempt when conduct tends directly to prevent the discharge of their functions." (*Wood* v. *Georgia* (1962) 370 U.S. 375, 383 [8 L.Ed.2d 576, 82 S.Ct. 1364].) "It is well established that a court has inherent power to punish for contempt of court [citation]." (*In re*

*Buckley* (1973) 10 Cal.3d 237, 247, cert. den. 418 U.S. 910 [110 Cal.Rptr. 121, 514 P.2d 1201, 68 A.L.R.3d 248].) The contempt power thus exists independent from legislative sanction although in this case the Legislature has specifically recognized that the juvenile court retains the ordinary contempt powers. (§ 213.)[3]

█ Although petitioner concedes that the juvenile court in general retains authority to hold wards who disobey its orders in contempt, he argues that, with respect to truants and other status offenders, the Legislature has specifically proscribed the incarceration of such juveniles even as a sanction for contempt. He relies on sections 601, subdivision (b) and 207. In response, the People argue (1) that the limitations of those sections are inapplicable to the contempt setting, and (2) that if the sections were intended to limit the contempt power, they could not constitutionally do so. As we shall explain, we find that there is no need to reach the constitutional question in this case because we conclude that the applicable statutes can and should be harmonized to both preserve the trial court's contempt authority and at the same time give recognition to the legislative policy reflected in sections 601, subdivision (b) and 207.

We begin with the actual language of those sections. The relevant portion of section 601, subdivision (b) states "it is the intent of the Legislature that no minor who is adjudged a ward of the court pursuant solely to this subdivision shall be removed from the custody of the parent or guardian except during school hours." Section 207, subdivision (a) states in pertinent part: "[n]o minor shall be detained in any jail, lockup, juvenile hall, or other secure facility who is taken into custody solely upon the ground that he or she is a person described in Section 601 or adjudged to be such or made a ward of the juvenile court solely upon that ground . . . ."

While the language of the statutes clearly indicates that the Legislature has determined that no juvenile is to be detained in jail or juvenile hall "solely upon the ground that he or she is a person described in section 601," neither statute expressly indicates that it was intended to apply to the contempt setting. █ █ Although the ascertainment of legislative intent is the paramount principle of statutory interpretation (*Pollack* v. *Department of Motor Vehicles* (1985) 38 Cal.3d 367, 372 [211 Cal.Rptr. 748, 696 P.2d 141]; see also *People* v. *Craft* (1986) 41 Cal.3d 554, 559 [224 Cal.Rptr. 626, 715 P.2d 585]), the statutory language does not reveal

---

[3] Section 213 states "[a]ny willful disobedience or interference with any lawful order of the juvenile court or of a judge or referee thereof constitutes a contempt of court." While no case has yet construed the scope of this section, the penalties for violation of section 213 are apparently those set forth in Code of Civil Procedure section 1218 for contempts generally: a fine of up to $1,000, imprisonment of up to five days, or both.

whether the Legislature intended sections 601, subdivision (b) and 207 to apply to the contempt situation.

A consideration of "the legislative history of the statute as well as the historical circumstances of its enactment" (*People* v. *Black* (1982) 32 Cal.3d 1, 5 [184 Cal.Rptr. 454, 648 P.2d 104]) is similarly unhelpful. Truancy has long been a concern of the state but section 601 was codified in largely its present form in 1961. (Stats. 1961, ch. 1616, § 2, pp. 3471-3472.) Over the years, the statute was altered and renumbered several times in ways not material to our present inquiry. The most important overall change was to require referral of truants to school attendance review boards before juvenile court intervention. In 1975, the Legislature added the school hours limitation to section 601, subdivision (b). (Stats. 1975, ch. 1183, § 2, pp. 2917-2918.)

The Legislature's move towards utilizing the school attendance review boards as a condition precedent to the juvenile court's intervention is understandable and in keeping with legal commentary calling for greater participation of school and social welfare professionals, even to the exclusion of the juvenile court's jurisdiction.[4] However, no legislative statement of purpose exists concerning the Legislature's imposition of a school-hours limitation. More to the point, there is no evidence suggesting the Legislature intended this new provision to either include or except juvenile contemners.

The history of section 207 and its prohibition on secure detention for status offenders also fails to inform us whether the Legislature intended to

---

[4] See Ketcham, *Why Jurisdiction Over Status Offenders Should be Eliminated from Juvenile Courts* (1977) 57 B.U.L. Rev. 645 (advocating the elimination of juvenile court jurisdiction over status offenders). Judge Ketcham was writing in support of the 1977 tentative draft of the Standards Relating to Noncriminal Misbehavior, written by the Institute of Judicial Administration and American Bar Association, Joint Commission on Juvenile Justice Standards. (But see Arthur, *Status Offenders Need a Court of Last Resort* (1977) 57 B.U.L. Rev. 631 [assailing the same standards].)

Others have recommended an initial referral to social welfare professionals and intervention of the court only after such a referral has proved fruitless. (See Comment, *Legislative Response to In re Ronald S.; Cal. A.B. 958* (1978) 5 Pepperdine L.Rev. 847, 854 [proposing the same as an alternative] [hereafter cited as Comment].) However, the commentators seem unanimous in calling for greater intervention of social welfare and mental health professionals. The Juvenile Court Law Revision Commission recently came to the same conclusion. In its January 1984 final report (Report), the commission concluded that the secure confinement of truants was not appropriate but instead recommended strengthening the power of the school attendance review boards. "Truancy is often a symptom of problems which may or may not be related to school, such as undiagnosed learning disabilities, misprogramming of the student by the school, problems with authority, personal problems, inner conflicts, home problems and the like. A strengthened SARB [school attendance review board] would be better able to diagnose the problem *and* prescribe a program appropriate to the student from among the many programs available through the education system and/or community programs." (*id.,* at p. 66, italics in original.)

affect the juvenile court's contempt power. Section 207 was first added to the code as part of the Arnold-Kennick Juvenile Court Law in 1976 (Stats. 1976, ch. 1068, § 1.5, p. 4741), and was a mirror image of former section 507, added to the code in 1961. (Stats. 1961, ch. 1616, § 2, p. 3461.)[5]

This initial version of section 207 permitted the secure detention of status offenders if no other option was available. However, the Legislature amended the statute the next year to prohibit such detention of status offenders. (Stats. 1977, ch. 1241, § 1, p. 4180.) Slight alterations were made in the following years but none of these amendments shed light on the applicability of section 207 to juvenile contemners. Thus, an examination of the history of sections 601, subdivision (b) and 207 yields no clue as to whether the Legislature intended these sections to limit a juvenile court's power to place a contemptuous status offender in secure surroundings during non-school hours.

The structure of section 207 itself provides some hint as to our Legislature's intent, however. In addition to generally proscribing the secure detention of status offenders, that section permits three exceptions.[6] ▮ "Under the familiar rule of construction, *expressio unius est exclusio alterius,* where exceptions to a general rule are specified by statute, other exceptions are not to be implied or presumed. [Citations.] This rule, of course, is inapplicable where its operation would contradict a discernible and contrary legislative intent. [Citation.]" (*Wildlife Alive* v. *Chickering* (1976) 18 Cal.3d 190, 195 [132 Cal.Rptr. 377, 553 P.2d 537]; see also *Cianci* v. *Superior Court* (1985) 40 Cal.3d 903, 918 [221 Cal.Rptr. 575, 710 P.2d 375] [citing *Chickering*].) Thus, subject to a "discernible and contrary legislative intent," it is possible the Legislature, by specifying three exceptions to the general ban against secure detention for status offenders without also excepting juvenile contemners from the general rule, intended the general rule to apply to contemners.

This reasoning is arguably consistent with the timing of the enactment of the exceptions in section 207. Little more than one year prior to the

[5] The People find the timing of the enactment of section 207—one year after the enactment of the school hours limitation in section 601, subdivision (b)—significant. They argue this timing reveals the Legislature's intent that the school-hours limitation should apply to section 601, subdivision (b) wards (i.e., truants) while the secure-confinement ban in section 207 should apply only to section 601, subdivision (a) wards (i.e., out-of-control minors). Inasmuch as section 207 was a verbatim reenactment of former section 507 which dates back to 1961, this argument is meritless.

[6] The exceptions are: for up to 12 hours to determine whether there are outstanding wants, warrants, or holds against the minor where the arresting officer or the probation officer has cause to believe such holds exist (§ 207, subd. (b)(l)); for up to 24 hours to locate the minor's parents (§ 207, subd. (b)(2)); and for up to 72 hours where location of the minor's parents and his return to them cannot be reasonably accomplished within 24 hours. (§ 207, subd. (b)(3); see Stats. 1978, ch. 1061, § 1, pp. 3271-3272.)

enactment of the section 207 exceptions, a court confronted the instant statutory scheme for the first time. In *In re Ronald S.* (1977) 69 Cal.App.3d 866 [138 Cal.Rptr. 387], a minor was adjudged a section 601 ward and sent to a nonsecure crisis center, from which he promptly walked away. A section 602 petition was thereafter filed, alleging the minor had violated Penal Code section 166.4, making it a misdemeanor to wilfully disobey "any process or order lawfully issued by any Court." The petition was sustained and he was ordered detained in juvenile hall, a secure facility.

The minor's petition for a writ of habeas corpus was granted by Division Two of the Court of Appeal of the Fourth Appellate District. The court noted that under prior law, a juvenile could become a section 602 ward by failing to obey a lawful order of the juvenile court. Thus, by walking out of a foster home or failing to attend school, a section 601 ward was transformed into a section 602 ward, i.e., a juvenile delinquent. Observing that such express "bootstrapping" was eliminated by a 1976 amendment deleting failure to obey a court order as a basis for sustaining a section 602 petition (see Stats. 1976, ch. 1071, § 12, p. 4819), the court reasoned that resort to Penal Code section 166.4 to sustain a section 602 petition and thereby justify secure incarceration was contrary to legislative intent. To permit such a procedure, the court noted, would render the "deletion of language in section 602 . . . meaningless and we would simply revert to the bootstrapping operation again. The court would be doing by indirection that which cannot be done directly. As the law now stands, the Legislature has said that if a [section] 601 [ward] wants to run, let him run. While this may be maddening, baffling and annoying to the juvenile court judge, ours is not to question the wisdom of the Legislature." (*Ronald S., supra,* 69 Cal.App.3d at p. 874.) Thus, after *Ronald S.,* it was clear that the secure detention of a status offender could not be justified by converting him into a section 602 ward via a criminal contempt citation. (See also *In re Mary D.* (1979) 95 Cal.App.3d 34 [156 Cal.Rptr. 829] [following *Ronald S.* on different facts].)

Because the section 207 exceptions were enacted just over a year later, those provisions may have been a response to the *Ronald S.* decision. (See Comment, *supra.*) However, since none of the exceptions in section 207, subdivision (b) (then numbered (c)) embrace the juvenile contemner situation, we can initially infer the Legislature intended to preserve the *Ronald S.* holding. ■ " 'Where a statute has been construed by judicial decision, and that construction is not altered by subsequent legislation, it must be presumed that the Legislature is aware of the judicial construction and approves of it.' " (*Wilkoff* v. *Superior Court* (1985) 38 Cal.3d 345, 353 [211 Cal.Rptr. 742, 696 P.2d 134], quoting *People* v. *Hallner* (1954) 43 Cal.2d 715, 719 [277 P.2d 393].)

Although *Ronald S.* involved a contemptuous status offender, it also involved elevating a section 601 ward to delinquency status as a result of the contempt, something not done in petitioner's case. Thus, even assuming we can infer that the Legislature intended to preserve the *Ronald S.* holding (i.e., that a contempt conviction pursuant to Pen. Code, § 166, subd. 4 is impermissible to justify secure confinement via a section 602 wardship proceeding), that decision does not answer the question of whether a juvenile court is prohibited by sections 601, subdivision (b) and 207 from ordering the secure, non-school-hours detention of a contemptuous status offender without converting the youth into a section 602 ward.[7]

We are similarly unable to infer legislative intent from the comparatively recent enactment of sections 207 and 601, subdivision (b) as compared to the more general section 213. Section 213 has existed in some form for decades.[8] By contrast, sections 207 and 601, subdivision (b) were enacted comparatively recently. ■ Thus, one could infer that the Legislature intended sections 207 and 601, subdivision (b) to limit a court's power under section 213 because later enacted statutes ordinarily control over previously enacted statutes and we should assume the Legislature was aware of section 213 when it enacted sections 207 and 601, subdivision (b). (*In re Misener* (1985) 38 Cal.3d 543, 553 [213 Cal.Rptr. 569, 698 P.2d 637]; *Fuentes* v. *Workers' Comp. Appeals Bd.* (1976) 16 Cal.3d 1, 7 [128 Cal.Rptr. 673, 547 P.2d 449].)

Similarly, one could argue sections 207 and 601, subdivision (b) should control because they are more specific in scope than section 213, and specific statutory provisions relating to a particular subject normally control as against more general provisions concerning the same subject. (*Bailey* v. *Superior Court* (1977) 19 Cal.3d 970, 976-977, fn. 8 [140 Cal.Rptr. 669, 568 P.2d 394]; see also 58 Cal.Jur.3d Statutes, § 108, p. 483.)

---

[7] The dissent thus reads *Ronald S.* too broadly when it concludes that "[n]othing could be clearer than the [*Ronald S.*] court's conclusion that even contempt of a court's dispositional order in a section 601 wardship cannot be punished by incarceration." (*post*, at p. 302.) As the dissent states in an earlier passage, the "whole purpose of the 1976 amendments was to end the practice of bootstrapping a status offender *into a section 602 ward*." (*Post*, at p. 302, italics added.) Inasmuch as there was no attempt in this case to elevate petitioner's status to that of a delinquent, we reiterate that *Ronald S.* does not fully resolve the question of whether secure confinement of contemptuous truants is permissible if no attempt is made to convert them into section 602 wards.

[8] The express statutory power to hold an uncooperative juvenile in contempt of court, expressed today in section 213, has long been a part of the code. It was first inserted into the code in 1915 (see Stats. 1915, ch. 631, p. 1228), and existed in various versions until it was codified as former section 579 in substantially the same formulation as its present form. (See Stats. 1937, ch. 369, p. 1022; see also Stats. 1961, ch. 1616, p. 3462 [recodifying former § 579 as former § 512].)

However, these are tenuous inferences inasmuch as they require that we infer the Legislature intended to override the juvenile court's contempt power without expressly stating such a purpose. Given the fundamental nature of the contempt power (see discussion, *ante*), we should not presume the Legislature intended to override such long-established power "unless such intention is made clearly to appear either by express declaration or by necessary implication [citation]." (*People* v. *Davenport* (1985) 41 Cal.3d 247, 266 [221 Cal.Rptr. 794, 710 P.2d 861], citing *Fuentes, supra,* 16 Cal.3d at p. 7.)

The dissent would divine legislative intent from a pilot program established by the Legislature which permits, under certain conditions, the secure confinement of section 601, subdivision (a) wards, i.e., runaways and out-of-control minors. (*Post,* at p. 304.) Because the Legislature passed a special law to permit such confinement, the dissent finds the conclusion "unavoidable" that the Legislature must understand that secure confinement is otherwise impermissible for status offenders.

However, a close reading of the legislation creating the pilot program shows the Legislature has gone much farther than merely permitting incarceration of runaways. Subject to enumerated procedural safeguards (such as a timely probable cause hearing), a section 601, subdivision (a) ward may be held in secure confinement for up to 72 hours, not including nonjudicial days, *if it is merely alleged* that he or she violated a related dispositional order. (Stats. 1986, ch. 1369, § 1, italics added.) Hence, the pilot program does not simply permit incarceration after a hearing, it authorizes *prehearing* confinement as a means of preventing crimes both by and against such juveniles. Therefore, even if the Legislature understood that secure confinement was a permissible sanction for a status offender's contempt of court, it would still follow that such special legislative authorization would be needed to justify the prehearing confinement permitted by the pilot program. To the extent the dissent asserts we can infer the Legislature's intent regarding incarceration of status offenders in general from its enactment of the pilot program, it is unpersuasive.

■ Viewing the statutory scheme as a whole, we thus conclude that while the legislative history demonstrates an intent to prohibit the juvenile court from relying on a ward's violation of a court order as a justification for elevating a section 601 ward to a delinquent (*Ronald S., supra,* 69 Cal.App.3d 866), there is nothing in that history which specifically indicates that the Legislature intended to prohibit a juvenile court from enforcing obedience to a court order through a contempt sanction that does not alter

the status of the ward.[9] Moreover, the Legislature's failure to expressly mention section 213 in either section 601, subdivision (b) or 207, or to amend section 213 itself, provides some evidence that it did not intend the secure detention ban or the school hours limitation to affect the scope of the juvenile court's contempt powers.

By so concluding we avoid deciding whether the Legislature could constitutionally override the inherent contempt power of the courts. ■ "[W]e do not reach constitutional questions unless absolutely required to do so to dispose of the matter before us." (*People* v. *Williams* (1976) 16 Cal.3d 663, 667 [128 Cal.Rptr. 888, 547 P.2d 1000]; *Palermo* v. *Stockton Theatres, Inc.* (1948) 32 Cal.2d 53, 65-66 [195 P.2d 1]; see also 13 Cal.Jur.3d, Constitutional Law, § 57, pp. 106-107.)[10]

---

[9] The People argue we may infer that the Legislature intended to preserve a court's contempt powers by its use of the word "solely" in both section 601, subdivision (b) and section 207. From this, they contend petitioner was not ordered into custody "solely" because he was a section 601 ward but that it flowed from his status as a contemner. Although this interpretation of the word "solely" as used in sections 601, subdivision (b) and 207 may well be correct, we need not reach that issue in light of our conclusion that there is nothing in the legislative history demonstrating an intent to circumscribe the longstanding power of the juvenile court to punish contemners with incarceration.

[10] There is a serious question whether the Legislature could so severely limit the inherent contempt power of the court. While limitations are permitted, the Legislature cannot "fetter the power itself" without impinging on the constitutional powers of the court. (*In re Shortridge* (1893) 99 Cal. 526, 532 [34 P. 227].) We previously approved some limitations on a court's contempt power when we upheld the validity of Code of Civil Procedure section 1218, which then limited the punishment for contempt to five days in jail and a $500 fine. (*In re Garner* (1918) 179 Cal. 409 [177 P. 162], disapproved on another point in *In re Lynch* (1972) 8 Cal.3d 410, 424, fn. 15 [105 Cal.Rptr. 217, 503 P.2d 921].)

In *Garner,* we were careful to note, however, that while the Legislature could impose some limitations upon the contempt power, any regulation which "takes from the courts all power to punish for contempt, *or fixes a penalty wholly inadequate for the purpose,* would not be countenanced by the courts." (*Garner, supra,* 179 Cal. at pp. 411-412, italics added.) Stated more forthrightly, a legislative act eliminating available sanctions for contempt of court, which leaves the remaining penalties wholly inadequate to vindicate the power of the court, is unconstitutional. (See *In re San Francisco Chronicle* (1934) 1 Cal.2d 630, 634-665 [36 P.2d 369]; *Shortridge, supra,* 99 Cal. 526.)

It is arguable that without the ability to order the secure, nonschool hours detention of a contemptuous status offender, a court's remaining sanctions are "wholly inadequate" to achieve the purpose underlying the contempt power. Under sections 207 and 601, subdivision (b), the juvenile court could punish a contemptuous minor by, among other things, ordering him or her detained in a nonsecure facility during school hours, to pay a fine, or to perform community work. However, the recalcitrant ward could refuse those directives with impunity since without the power to order secure confinement, the juvenile court's effective options would then be exhausted. As the Court of Appeal observed below, "[i]t is difficult to equate this result with punishment. In our view, such a constraint upon the court's power to punish for contempt would completely undermine the dignity and authority of the court, [and] make the court a laughing stock in the eyes of the very persons it is charged with the duty to supervise and control . . . ."

As stated above, however, we need not reach this question because we find the Legislature has not circumscribed the juvenile court's contempt powers by its enactment of sections 207 and 601, subdivision (b).

■ Although we conclude the limitations as stated in sections 207 and 601, subdivision (b) were not intended to affect the juvenile court's power to punish a contemptuous section 601 ward with secure detention during nonschool hours, we need not ignore the Legislature's general intent to deinstitutionalize status offenders. ■ " '[E]very statute should be construed with reference to the whole system of law of which it is a part so that all may be harmonized and have effect. [Citations.]' " (*Landrum* v. *Superior Court* (1981) 30 Cal.3d 1, 14 [177 Cal.Rptr. 325, 634 P.2d 352], quoting *Stafford* v. *Realty Bond Service Corp.* (1952) 39 Cal.2d 797, 805 [249 P.2d 241].) ■ Thus, although the Legislature's general prohibition on the secure detention during nonschool hours for section 601 wards does not apply to contemners, respect for the intent of our coequal branch of government demands that courts exercise caution when imposing such sanctions against contemptuous status offenders.

In mandating that courts exercise caution before ordering a status offender into secure custody for a contemptuous act, we do not paint on a wholly blank canvas. In 1974, Congress passed the Juvenile Justice and Delinquency Prevention Act (hereafter the Act) (42 U.S.C. §§ 5601-5640 (1976) & Supp. III 1979, as amended by Juvenile Justice Amendments of 1980, Pub. L. No. 96-509, 94 Stat. 2750), conditioning block grants to the states on compliance with the Act's requirement of the deinstitutionalization of status offenders.[11] As a result, nearly every state in the union passed a statute similar to section 207. (See *Costello & Worthington, supra,* at p. 53, fn. 50.)

Thus, many of our sister states have already confronted the problem of how juvenile courts can effectively deal with status offenders who continually disobey the court's orders if secure incarceration is not an available option. Most states have affirmed their courts' use of the contempt power to order the secure detention of contemptuous status offenders despite an expression of legislative intent generally banning such detention (*In the Interest of D.L.D.* (1983) 110 Wis.2d 168 [327 N.W.2d 682]; *Interest of*

---

[11] Interestingly, the Act initially prohibited incarcerating a status offender after elevating him to delinquency status due to his failure to comply with a court order. (Legal Opinion No. 77-25—Classification of Juveniles as Status Offenders (Mar. 15, 1977) [from the Office of the General Counsel of the Law Enforcement Assistance Administration].) However, section 5633, subdivision (a)(12)(A) of title 42 of the United States Code was amended in 1980 and now requires the states to file a plan to achieve the goal, within three years, "that juveniles who are charged with or who have committed offenses that would not be criminal if committed by an adult *or offenses which do not constitute violations of valid court orders* . . . shall not be placed in secure detention facilities or secure correctional facilities." (Italics added.) The amended Act would now apparently except juvenile contemners from its general requirement of abolishing the secure confinement of status offenders. (See *Costello & Worthington, supra,* at p. 55 and accompanying fns.)

*Darlene C.* (1983) 278 S.C. 664 [301 S.E.2d 136]; *State v. Norlund* (1982) 31 Wn.App. 725 [644 P.2d 724]; *In re G.B.* (1981) 88 Ill.2d 36 [430 N.E.2d 1096] cert. den. 456 U.S. 963 [72 L.Ed.2d 487, 102 S.Ct. 2041]; *State ex rel. L.E.A. v. Hammergren* (Minn. 1980) 294 N.W.2d 705), although a minority of states have disapproved this practice. (*W. M. v. State* (Ind.App. 1982) 437 N.E.2d 1028; *Interest of Tasseing H.* (1980) 281 Pa.Super. 400 [422 A.2d 530] [holding an adjudication of delinquency against a status offender based on contempt was improper].)

*Interest of D.L.D., supra,* 110 Wis.2d 168, is perhaps most illustrative. In that case, the Supreme Court of Wisconsin was faced with a minor declared a "child in need of protection or services" (i.e., a status offender) who was not following the court's previously ordered conditions of supervision. The trial court found the minor in contempt of court, ordered the minor to serve 20 days in secure detention, and the intermediate appellate court affirmed. The high court reasoned that although the Wisconsin Children's Code generally prohibited the secure incarceration of status offenders with some exceptions,[12] the statutory limitation cannot operate to deprive the court of its inherent contempt powers to enforce its orders.

However, the Wisconsin Supreme Court then stated: "[t]his court recognizes that the power of contempt is an extraordinary one that should be used sparingly and with the utmost sensitivity. This caveat is especially true since the 1977 revisions to the Children's Code adopted the general policy of deinstitutionalizing status offenders. Accordingly, we determine that a status offender may be found in contempt and incarcerated, but with the following limitations: (1) the juvenile is given sufficient notice to comply with the order and understands its provisions; (2) the violation of the court order is egregious; (3) less restrictive alternatives were considered and found to be ineffective; and (4) special confinement conditions are arranged consistent with . . . [the statutory provisions barring intermingling with delinquents]." (*Interest of D.L.D., supra,* 110 Wis.2d at p. 182 [327 N.W.2d at p. 689].)

These four qualifications are sound and we hold California courts should adhere to them. Imposition of these qualifications on a juvenile court's contempt power achieves the twin goals of vindicating the inherent power of the courts while giving practical effect to the Legislature's express intent

---

[12] Exceptions include where there is probable cause to believe (1) the child will injure himself or herself or others, or will be subjected to injury by others; (2) the parents or legal guardians of the child are unable or unwilling to provide adequate supervision or care of the child; or (3) the child will run away or be taken away and thus be unavailable for aftercare supervision. (See Wis. Child. Code, § 48.205, quoted in *Interest of D.L.D., supra,* 110 Wis.2d at p. 175 [327 N.W.2d at p. 686].)

to deinstitutionalize status offenders in general. The necessity of the first requirement is self-evident; due process concerns would be implicated if the juvenile who lacked notice of the court's orders was held in contempt for violating those orders. (*Arthur* v. *Superior Court* (1965) 62 Cal.2d 404, 408-409 [42 Cal.Rptr. 441, 398 P.2d 777]; *Rosenstock* v. *Municipal Court* (1976) 61 Cal.App.3d 1, 6-7 [132 Cal.Rptr. 59].)

The requirement of an egregious violation ensures that secure incarceration will not become a commonplace sanction in contravention of the Legislature's intent to comply with the federal mandate to deinstitutionalize status offenders. (Accord *Hammergren, supra,* 294 N.W.2d at p. 707.) The reservation of the nonschool hours, secure detention sanction for the most severe cases will require the juvenile court to decide whether, based on the entire record, imposition of this harsh penalty is justified because no other sanction will suffice. Moreover, this requirement has the additional benefit of ensuring our juvenile courts will exercise this facet of their inherent contempt power to the least extent possible so as to give maximum effect to the Legislature's avowed intent to house status offenders in nonsecure surroundings.

The third requirement—consideration and rejection of less restrictive sanctions—is closely akin to the second requirement that the violation of the court's order be egregious since it too has its genesis in the idea that incarceration should be the exception, not the rule. While the court need not necessarily have attempted lesser penalties before imposing secure confinement (cf. *In re John H.* (1978) 21 Cal.3d 18, 27 [145 Cal.Rptr. 357, 577 P.2d 177] [lesser dispositional alternatives need not be shown to have failed in a delinquency case where the evidence shows the minor will derive a probable benefit from a Youth Authority commitment]), the record should indicate that lesser alternatives were considered by the juvenile court before ordering incarceration. (Contra *Norlund, supra,* 31 Wn.App. at p. 729 [644 P.2d at p. 727] [requiring a showing on the record that less restrictive alternatives have "failed"]; *Hammergren, supra,* 294 N.W.2d at pp. 707-708 [same].)

By requiring the juvenile court to memorialize its findings on the record, we again ensure the court is aware that, by ordering the secure confinement of a juvenile who has not committed a criminal offense, it is taking the extraordinary step of acting contrary to the wishes of the Legislature but is justified in doing so because it is convinced there is no other alternative which will adequately serve the purpose of the contempt citation.

We can infer the Legislature would agree with these requirements concerning the egregiousness of the violation and that less restrictive

alternatives to secure detention were not feasible when we consider the Legislature's recent addition of section 1219.5 to the Code of Civil Procedure. (See Stats. 1984, ch. 1643, § 1, p. 5919.) That section provides that a minor under the age of 16 who refuses to take the oath or testify when called to do so should be referred to the probation officer in charge before imposition of sanctions for contempt of court.

This new section makes two other limitations applicable to the determination of the appropriate punishment for such a contempt of court. First, where the court is considering placing the minor outside his or her home, "the placement shall be in the least restrictive setting available." (Code Civ. Proc., § 1219.5, subd. (b).) Second, "the court shall not order the minor to be placed in a secure facility unless other placements have been made and the minor has fled the custody and control of the person under the control of whom he or she has been placed or has persistently refused to obey the reasonable and proper orders or directions of the person under the control of whom he or she has been placed." (*Ibid.*) However, less restrictive placements need not be first attempted if the court makes a finding on the record that the minor would likely flee if placed in a nonsecure facility. (Code Civ. Proc., § 1219.5, subd. (d).)

Although these requirements are applicable to a special type of juvenile contemner, they are substantially similar to those we impose on courts passing judgment on contemptuous status offenders in general. We may thus infer our requirements are consistent with the Legislature's manifested intent that if the secure detention of underage contemners is ordered, that decision is made with sensitivity for the relevant competing interests and that the court's decision be justified on the record.

Finally, the juvenile court ordering the incarceration of a status offender should also prohibit the minor from coming in contact with those minors confined due to their commission of a crime, i.e., section 602 wards. Although other states also impose this requirement, we need only turn to section 207 for a clear expression of our own Legislature's intent on this subject. Recall section 207, subdivision (b) provides three exceptions to the general prohibition on secure detention of section 601 wards. (*Ante,* fn. 6.) Subdivision (c) of that section provides "[a]ny minor detained in juvenile hall pursuant to subdivision (b) may not be permitted to come or remain in contact with any person detained on the basis that he or she has been taken into custody upon the ground that he or she is a person described in Section 602 or adjudged to be such or made a ward of the juvenile court upon that ground."

As if to emphasize the importance of the point, section 207, subdivision (d) further clarifies the matter: "[m]inors detained in juvenile hall pursuant

to Sections 601 and 602 may be held in the same facility provided they are not permitted to come or remain in contact within that facility." Moreover, the clear ban on the intermingling of section 601 and 602 wards finds expression in other statutory provisions as well. (See § 601.1, subd. (b) [to the extent practically feasible, § 601 wards participating in community service programs shall not be permitted to come in contact with § 602 wards participating in the same program]; cf. § 208 [no minor under 18 years old detained in an institution where adults are confined (subd. (a)) or in a state hospital where adults are committed (subd. (b)) shall be permitted to come in contact with such adults].) It thus seems manifest that incarcerated status offenders must be segregated so as to avoid contact with section 602 wards and others confined due to their criminal conduct.

We realize our decision permits the contemptuous status offender to suffer the major disadvantage heretofore reserved for section 602 wards: secure confinement during nonschool hours. However, the nature of the confinement suffered by the contemptuous status offender differs in at least one substantial respect: he cannot come in contact with other section 602 wards who may be confined in the same facility. This limitation, as recognized by the juvenile court below, is important to ensure the status offender's problems, noncriminal at that time, are not exacerbated by mingling with delinquents. We thus avoid the unsavory situation whereby "the youngster whose only offense against society was that he could not get along with his parents, found himself cheek by jowl with the underage rapist, robber or heroin peddler." (*Ronald S., supra,* 69 Cal.App.3d at p. 870.)

### CONCLUSION

█ Applying these standards here, we hold that although the juvenile court ensured petitioner had notice of and understood the court's orders, and properly ordered petitioner's confinement be arranged to prevent contact with section 602 wards, it made no express findings that petitioner's contumacious conduct was egregious or that less restrictive alternatives to incarceration were not feasible. In the present case, of course, the trial court was unaware it must make these specific findings before ordering confinement pursuant to its contempt authority. The judgment of the Court of Appeal is therefore reversed with directions to remand the cause to the trial court for further proceedings consistent with this opinion.

Lucas, C. J., Panelli, J., Eagleson, J., and Kaufman, J., concurred.

**BROUSSARD, J.**—I dissent. The Legislature has made it clear that juvenile status offenders are not to be incarcerated. The majority hold that the status offender who disobeys a court order to attend school can be

incarcerated, despite the fact that there is no statutory language, case law, or evidence of legislative intent to support such a conclusion. The majority ignore the Legislature's considered judgment that the harm which incarceration causes a status offender is too great to be permitted, even when the status offender fails to obey court orders. Instead the majority exalt the dignity of the court issuing the order over the best interest of the minor. Neither logic nor compassion can countenance such a result.

Welfare and Institutions Code section 601[1] provides for wardship proceedings for minors who are beyond the control of their parents or guardians, or who are truant. Minors declared wards of the court under this section are called status offenders, in contrast with minors made wards of the court and incarcerated under section 602 for violation of state or federal law. "A status offender might be defined as one whose only offense against society is doing something that would not be legally prohibited if done by an adult." (*In re Ronald S.* (1977) 69 Cal.App.3d 866, 867, fn. 1 [138 Cal.Rptr. 387].) A minor may be made a ward of the court under subdivision (a) of section 601 for persistent disobedience of his parents or guardians, and under subdivision (b) for truancy. Subdivision (b) concludes with these words: "[I]t is the intent of the Legislature that no minor who is adjudged a ward of the court pursuant solely to this subdivision shall be removed from the custody of the parent or guardian except during school hours."

Section 207, subdivision (a) provides, with exceptions no one argues are applicable here, that "[n]o minor shall be detained in any jail, lockup, juvenile hall, or other secure facility who is taken into custody solely upon the ground that he or she is a person described by Section 601 or adjudged to be such or made a ward of the juvenile court solely upon that ground . . . ."

Sections 601, subdivision (b) and 207, subdivision (a) prohibit the jailing of truants or other status offenders. Nonetheless, the majority hold that a directive not to jail truants does not prohibit jailing habitual truants who are in contempt of a court order to go to school. I do not agree with this conclusion. It is perfectly clear from the history of the relevant statutes that the Legislature has determined that jailing a status offender for contempt of court is not a good idea, and that the Legislature meant to prohibit such incarceration.

Before 1976, section 602 provided that a minor *could* be made a ward of the court under that section when the minor had been made a ward under

---

[1] All statutory references are to the Welfare and Institutions Code unless otherwise indicated.

section 601 and the minor failed "to obey any lawful order of the juvenile court." (Stats. 1972, ch. 84, § 1, p. 109.) This meant that a status offender could be treated as a juvenile criminal as soon as he was in contempt of a dispositional order under section 601. However, in 1976 this language was deleted from section 602. (Stats. 1976, ch. 1071, § 12, p. 4819.) Obviously, when the Legislature deletes language from a statute, it intends to change existing law. (*Clements* v. *T. R. Bechtel Co.* (1954) 43 Cal.2d 227, 231-232 [273 P.2d 5].) In the same act, the Legislature enacted the part of section 601, subdivision (b) prohibiting removing status offenders from the custody of parents except during school hours. (Stats. 1976, ch. 1071, § 11, p. 4818.) It also eliminated contact between status offenders and wards under section 602, by providing that the status offender could not be detained in juvenile hall or other secure facility, but must be detained in a sheltered-care facility or crisis-resolution home. (See former § 507, subd. (b), as amended by Stats. 1976, ch. 1071, § 7, p. 4817, now renumbered § 207.)

This clear indication that the Legislature intended to separate all status offenders from section 602 wards, and intended that even incorrigible status offenders not be incarcerated in secure facilities, was made express in *In re Ronald S., supra,* 69 Cal.App.3d 866, 873. There the juvenile court, faced with a runaway who would not obey court orders to stay in a sheltered-care facility, caused a petition to be filed alleging a violation of Penal Code section 166, subdivision 4: contempt of court. Since a violation of this section is a criminal offense, the minor was adjudged a section 602 ward and placed in juvenile hall. Wrong, said the Court of Appeal. The whole purpose of the 1976 amendments was to end the practice of bootstrapping a status offender into a section 602 ward by charging the minor with contempt of court. "While it may seem ridiculous to place a runaway in a nonsecure setting, nevertheless, that is what the Legislature has ordained. The Legislature has determined that 601's shall not be detained in or committed to secure institutions even if this makes juvenile court judges look ridiculous. . . . [Otherwise] a deletion of language in section 602 would become meaningless and we would simply revert to the bootstrapping operation again. The court would be doing by indirection that which cannot be done directly. As the law now stands, the Legislature has said that if a 601 wants to run, let him run. While this may be maddening, baffling and annoying to the juvenile court judge, ours is not to question the wisdom of the Legislature." (*Id.* at pp. 873-874.) Nothing could be clearer than the court's conclusion that even contempt of a court's dispositional order in a section 601 wardship cannot be punished by incarceration.[2]

---

[2] The Court of Appeal reached a similar conclusion in *In re Mary D.* (1979) 95 Cal.App.3d 34 [156 Cal.Rptr. 829], where a section 602 ward who was placed in the parental home violated probation by running away from home to another state. The juvenile court held her in contempt under Penal Code section 166, subdivision 4 and ordered her to spend up to six

The Legislature has acquiesced in this interpretation of its intent. " 'Where a statute has been construed by judicial decision, and that construction is not altered by subsequent legislation, it must be presumed that the Legislature is aware of the judicial construction and approves of it.' " (*Wilkoff* v. *Superior Court* (1985) 38 Cal.3d 345, 353 [211 Cal.Rptr. 742, 696 P.2d 134], quoting *People* v. *Hallner* (1954) 43 Cal.2d 715, 719 [277 P.2d 393]; see also *People* v. *Rogers* (1971) 5 Cal.3d 129, 136 [95 Cal.Rptr. 601, 486 P.2d 129].)

The court in *Ronald S., supra,* 69 Cal.App.3d 866, relied on new provisions of section 601 and the then applicable section 507, and on the fact that the Legislature amended section 602 to eliminate the power to make a section 601 ward into a section 602 ward for contempt of court. Later amendments have never repudiated or contradicted the *Ronald S.* interpretation. In fact, they have reinforced it. Although the language of the original section 207 permitted the secure detention of status offenders if no other option was available, after *Ronald S.* was decided in 1977, the Legislature amended the section to flatly prohibit such a detention. (Stats. 1977, ch. 1241, § 1, p. 4180, eff. Oct. 1, 1977.) A later amendment added certain exceptional circumstances in which the status offender could be incarcerated. (Stats. 1978, ch. 1061, § 1, pp. 3271-3272.) The Legislature explained: "It is the intent of the Legislature that this act restores to local entities the ability to provide secure detention, under specified conditions, for persons described in Section 601 of the Welfare and Institutions Code." (*Id.,* § 3, p. 3273.) The Legislature evidently thought that the 1976 and 1977 legislation had eliminated the power to order secure confinement entirely, so that it was necessary to specify some exceptions. Since the exceptions do not apply to contempt of court, the inference becomes even stronger that the Legislature acquiesced in the holding of *Ronald S., supra,* 69 Cal.App.3d 866, and did not intend to allow incarceration of truants who disobey a court order to go to school. (See *Wildlife Alive* v. *Chickering* (1976) 18 Cal.3d 190, 195 [132 Cal.Rptr. 377, 553 P.2d 537] ["where exceptions to a general rule are specified by statute, other exceptions are not to be implied or presumed"].)

Though neither section 601 nor section 602 has been amended since *Ronald S.* was decided, the Legislature has added an uncodified statute

---

months in a secure facility. The Court of Appeal reversed, finding that a juvenile court could not order secure placement for running away, since this was only a status offense, and since section 602 had been amended so that it no longer subjected a minor to section 602 placement for disobeying a court order. "It is the technical violation of the court's order to obey the terms of probation which the court uses to make it a more serious offense. The court has used criminal contempt to contravene legislative intent, and attempted to do indirectly what it could not do directly." (*Id.* at p. 38.)

which reinforces the *Ronald S.* conclusion that contempt of a section 601 order cannot be punished by incarceration. The statute requires the Department of Youth Authority to establish a pilot program in one county to study the effectiveness of placing in secure facilities status offenders under section 601, subdivision (a) who violate a court order. (See Stats. 1986, ch. 1369, § 1, No. 6 Deering's Adv. Legis. Service, pp. 301-303, No. 12 West's Cal. Legis. Service, p. 693.) This statute is obviously designed to respond to the concern expressed in *Ronald S.* that runaways will disobey court orders to stay in nonsecure facilities. In this statute the Legislature finds and declares that wards under section 601, subdivision (a) who have violated related dispositional orders (i.e., been in contempt of court) "have a greater propensity to become involved in crimes, either as a victim or as a perpetrator. Consequently, the Legislature finds that it is necessary to establish a pilot program in one county to assess the effectiveness of court-ordered secure detention for up to five days for the benefit of the minor." (*Ibid.*) Accordingly, the Legislature provided for a pilot program, with elaborate procedures, allowing secure placement for up to five days not more than twice a year of wards under section 601, subdivision (a) who have violated a dispositional order related to the wardship order. The Department of Youth Authority is to determine whether secure placement of these wards causes the number of crimes committed by or on the wards to fall during the pilot program. (*Ibid.*)

The conclusion is unavoidable that the Legislature understands that in every county but the pilot program county, a section 601, subdivision (a) ward who disobeys a dispositional order cannot be held in a secure placement. If it were otherwise, there would be no need for the special authorization for secure placement contained in this pilot program. Further, the data collected on whether secure placement reduced crime by or on these wards in the pilot county would be meaningless if secure placement is already available through the contempt power of the court.

Legislative authority for jailing truants for contempt of a section 601 order simply does not exist. I also see no constitutional infirmity in a system which prohibits incarceration of habitual truants. Though a court has the inherent power to punish contempt, the Legislature may place reasonable limitations on this power. (*In re McKinney* (1968) 70 Cal.2d 8, 10-11 [73 Cal.Rptr. 580, 447 P.2d 972].) A statute that took away all contempt power from the court or fixed a "wholly inadequate" penalty for a class of contempts would be an unconstitutional invasion of the court's power. (*Id.* at p. 11.) But as long as the court retains the power to "vindicate [its] authority and maintain the dignity and respect due to [it]," the legislative regulation of the contempt power is considered within constitutional bounds. (*Id.* at p. 12.)

The juvenile court can punish the repeat truant for contempt, staying within the bounds of the section 601 wardship, by imposing fines, compulsory service to the community, or detention in nonsecure facilities during school hours. Under present law, except in the pilot county, the juvenile court cannot incarcerate a minor made a ward of the court as a result of his truancy for willfully failing to obey the court's order to attend school. In holding otherwise, the majority reach too far.

Mosk, J., concurred.