22 P.3d 987

**In the Interest of Jane DOE, Born on June 16, 1983, Minor–Appellant.**

**No. 21876.**

Intermediate Court of Appeals of Hawai'i.

Dec. 22, 1999.

Theodore Y. Chinn, Deputy Public Defender, for defendant-appellant.

James Anderson, Deputy Prosecuting Attorney, City and County of Honolulu, for plaintiff-appellee.

BURNS, C.J., WATANABE, and ACOBA, JJ.

Opinion of the Court by ACOBA, J.

We hold that the family court may not adjudicate a minor in criminal contempt for violating a court order unless it had previously informed the minor of the nature of a contempt of court charge and the consequences of being found in contempt. Minor–Appellant Jane Doe (Doe) was not so informed by the family court of the first circuit (the court)[1] in this case, and therefore, should not have been adjudged in criminal contempt of the court. While as a *general* matter the family court may find a minor in contempt of court, we further hold that a status offender, that is, a minor coming within the jurisdiction of the family court on noncriminal allegations or grounds under Hawaiʻi Revised Statutes (HRS) § 571–11(2)(B), (C), or (D) (1993), may not be adjudicated in criminal contempt of court for conduct which although violating a family court order, constitutes a status offense as indicated in HRS § 571–2 (1993). Because Doe, a status offender, was so adjudicated by the court, we reverse the court's July 1, 1998 criminal contempt order.

---

1. Although we refer to the family court of the first circuit as "the court," the case was heard by two different judges.

Under HRS chapter 571 (1993), however, a status offender may be temporarily confined in secure facilities if he or she is believed to be in violation of a court order. A status offender may also be confined in excess of twenty-four hours if he or she is committed pursuant to a "valid court order" as that term is defined by the federal Juvenile Justice and Delinquency Prevention Act of 1974, as amended (JJDPA). We conclude that "valid court order" requirements were not satisfied in this case, and therefore Doe's criminal contempt incarceration in excess of twenty-four hours, excluding weekends and holidays, was wrong.

## I.

### A.

Doe was born in Honolulu, Hawai'i on June 16, 1983. She began attending the seventh grade at Wai'anae Intermediate School in 1995. During the 1995–96 school year, Doe was present for only sixty-three days and was absent for 112 days. Doe's maternal grandmother informed school officials that Doe "has a bad case of asthma which is why [Doe] stays home a lot." Doe failed all her classes and was retained. During the 1996–97 school year, Doe was present for sixty days, and was absent for 115 days. She again failed all of her classes and was retained at the seventh grade level. The absenteeism continued into the 1997–98 school year and by the end of the first semester, Doe had been absent a total of forty-nine days.

Doe, now sixteen years old, has been characterized as a student "capable of doing great work." However, her poor attendance resulted in her repeating the seventh grade three years in a row. School officials had considered alternative placement in an age-appropriate educational environment. The

2. The December 19, 1997 petition states:

The above-named child appears to come within the purview of [Hawai'i Revised Statutes (HRS) § 571-11(2) (1993)] ..., by reason of the following facts:
The minor resides in the City and County of Honolulu, State of Hawaii, ... Waianae, Hawaii 96792.

record does not reflect where Doe is currently attending classes.

### B.

On December 19, 1997, the State of Hawai'i (the State), through the Department of Education (DOE), filed a petition against Doe alleging violation of HRS § 571–11(2)(C), because of her truancy during the first semester of the 1997–98 school year.[2] HRS § 571–11(2)(C) states in part:

Except as otherwise provided in this chapter, the [family] court shall have exclusive original jurisdiction in proceedings:

. . . .

(2) Concerning any child living or found within the circuit:

. . . .

(C) Who is neither attending school nor receiving educational services required by law whether through the child's own misbehavior or nonattendance or otherwise[.]

At a January 14, 1998 hearing on the truancy petition (status hearing), Doe admitted to the violations. She was not represented by counsel at this status hearing. However, an unfiled "Rights Form" of the same date is contained in Doe's "social record" and indicates that Doe and her mother were apparently informed of her right to a lawyer, her right to remain silent, and her right to present witnesses.

Three separate documents were issued as a result of the status hearing. The order on the truancy petition, executed by the court, placed Doe on protective supervision of the court and DOE (the protective supervision order). HRS § 571–2 defines protective supervision as follows:

"Protective supervision" *means a legal status created by court order in proceedings not involving violations of law but*

Said minor did not receive educational services required by law in that said minor was absent, unexcused from Waianae Intermediate for 49 school days, specifically, September 3, 4, 5, 8, 9, 10, 11, 22, 25, 29 and 30, 1997; October 1, 2, 3, 6, 7, 8, 9, 10, 13, 14, 15, 16, 17, 20, 22, 23, 24, 27, 28, 29, and 31, 1997; and, November 3, 4, 5, 6, 7, 10, 12, 13, 14, 17, 18, 19, 20, 21, 24, 25 and 26, 1997.

where the legal custody of the minor is subject to change, whereby the minor is permitted to remain in the minor's home or in a community residential or nonresidential program under the supervision of the court or an agency designated by the court and subject to return to the court during the period of protective supervision.

(Emphasis added.) The protective supervision order included the following special conditions:

[1] Probation [o]fficer shall make a referral to have minor undergo a psychological evaluation thru [sic] [DOE and]

[2] *DOE shall make a referral to the [a]ppropriate prosecuting attorney to file a[c]ontempt of [c]ourt [charge] if minor fails to attend school.*[3]

(Emphasis added.) According to Doe's later testimony at her contempt trial, the court also orally ordered her to attend school.

A second document entitled, "Rules of Protective Supervision and Order" (the court rules), was appended to the protective supervision order. It informed Doe that she was to adhere to certain rules while under court protective supervision. The court rules stated in relevant part as follows:

1. *You are to obey the laws* of the City and County of Honolulu, State of Hawaii and U.S. Government. *Failure to do so may change your status to that of "LAW VIOLATOR."*

. . . .

4. *You must attend your classes at school regularly, unless excused by the school or this [c]ourt. . . .*

6. You are not to remain away from your residence overnight without first having permission from your parent(s), guardian(s), or foster parent(s).

(Emphases added; capitalization in original.) This order was signed by the court, Doe, and

her probation officer, Michelle Hussey (Hussey).

The third document, entitled "Rules of Protective Supervision to the Department of Education" (the DOE rules), was signed by Doe and her mother and was attached to and made a part of the court rules. The DOE rules state in relevant part:

1. You are to attend Waianae Int[ermediate] School or any school or program as directed by the Department of Education.

2. You are to attend each day and every class.

. . . .

*IF YOU FAIL TO OBEY THE ABOVE RULES, YOU MAY BE ORDERED TO PERFORM COMMUNITY SERVICE. MAJOR VIOLATIONS MAY RESULT IN DETENTION.*

THESE RULES WILL BE ATTACHED TO A COURT ORDER AND WILL BE A PART OF THAT COURT ORDER.

(Emphasis added; capitalization in original.)

After the status hearing, Hussey reviewed with Doe the provisions of the protective supervision order, the court rules, and the DOE rules. Doe signed the court rules beneath an acknowledgment stating, "THE ABOVE RULES OF MY PROTECTIVE SUPERVISION HAVE BEEN EXPLAINED TO ME. I UNDERSTAND AND ACCEPT THEM. I AGREE TO FOLLOW THE RULES AND TO COOPERATE WITH MY COURT OFFICER." (Capitalization in original.) Doe also signed the DOE rules beneath an acknowledgment stating, "THESE RULES WERE EXPLAINED TO ME AND I UNDERSTAND THEM." (Capitalization in original.)

C.

On January 29, 1998, Doe was arrested by the police and detained. On January 30, 1998, the State filed a petition against Doe for violating Rule 6 of the court rules.[4] On that day, a court hearing on the Rule 6

---

3. The January 14, 1998 protective supervision order was re-executed on January 22, 1998, without any changes from the original order.

4. The petition described the violation of Minor–Appellant Jane Doe (Doe) as follows:

On or about January 29, 1998 in the City and County of Honolulu, State of Hawaii, [Doe] was beyond the control of her mother, . . . in that [Doe] left home without permission and remained away until apprehended on January

petition was held. Doe was present with counsel. The court ordered that a "[c]ontempt of [c]ourt hearing (petition) shall be set before [the court.]" The court also issued a detention order, which indicated that Doe had been detained since 1:03 p.m. on January 29, 1998, and further ordered Doe to remain in detention.[5] The court authorized Doe's early release to her mother, once a psychological study mandated in the protective supervision order had been conducted. The record does not reflect that a contempt of court hearing was ever scheduled pursuant to the January 30, 1998 court order.

On April 3, 1998, the State filed two petitions against Doe pursuant to HRS § 571–11(2) for violations of Rule 4 of the court rules because Doe was allegedly absent from Wai'anae Intermediate for the months of February and March 1998 (truancy petitions). However, before the truancy petitions were heard, the State filed a criminal contempt of court petition (contempt petition) on April 27, 1998. The contempt petition alleged that Doe "appear[ed] to come within the purview of [HRS § 571–11(1) ] in that she allegedly violate[d] or attempt[ed] to violate the law" because she "did knowingly disobey or resist the process, injunction or other mandate of a court by violating Rule 4 of the [court rules] ordered by [the court] . . . thereby committing the offense of [c]riminal [c]ontempt of [c]ourt in violation of [HRS § 710–1077(1)(g) (1993) ]." HRS § 571–11(1) states in relevant part that

> [e]xcept as otherwise provided in this chapter, the [family] court shall have exclusive original jurisdiction in proceedings:
> Concerning any person who is alleged to have committed an act prior to achieving eighteen years of age which would constitute a violation or attempted violation of any federal, state, or local law or municipal ordinance.

## II.

### A.

At the July 1, 1998 trial on the contempt petition, the court took judicial notice of the

records and files of the case, including the January 14, 1998 protective supervision order and court rules. The court dismissed the truancy petitions as moot.

Hussey, Doe's mother, Doe's teacher at Wai'anae Intermediate School, Christi Wagatsuma (Wagatsuma), and the school's vice principal, Mark Tanji (Tanji), testified at Doe's contempt trial. None of them were questioned about the protective supervision order and its condition regarding contempt of court.

Wagatsuma related that Doe was her student for the 1997–98 school year and that Doe was absent for ten days between February 3 and March 2. These absences were unexcused.

Tanji testified that the school did not give Doe permission to be absent between February 3 and March 2 and the school did not receive prior notice of the absences.

Hussey recounted that she was present at the status hearing, but did not give any testimony regarding the court's oral order or the contempt charge. Hussey stated that after the status hearing, she explained to Doe the details of the protective supervision order, the court rules, and the DOE rules, and Doe acknowledged she understood these documents. During cross-examination, Hussey disclosed that she did not give Doe any legal advice, nor did she recall explaining the crime of contempt of court.

> Q [DEFENSE COUNSEL]: Did you inform [Doe] what contempt of court is?
>
> A: I reviewed her legal rights with her. *I don't recall whether or not I reviewed contempt charges, what that meant.*

(Emphasis added.)

At trial, Doe testified she did not comprehend the nature of the contempt charge:

> Q [DEFENSE COUNSEL]: . . . [D]o you remember what happened on that court date [January 14, 1998]?

---

29, 1998, which is in violation of Rule 6 of her Rules of Protective Supervision and Order.

**5.** The preprinted detention order did not specify for how long Doe was detained; there is simply a check mark next to the slot that states, "Minor shall remain in detention/Hale Ho'omalu."

A [DOE]: *The [j]udge gave me orders to go to school, but then they [sic] didn't tell me about the, what contempt of court was and if I violate it and what would happen.*

Q: *Did you have an attorney with you—*

A: *No.*

Q: —on that date? So you didn't have any legal representation?

A: I'm not sure.

Q: Did the Public Defender's Office represent you on that date?

A: No.

Q: Then you were basically by yourself?

A: Yeah, with my mom.

Q: Okay. When [the court], now *how did [the court] tell you about the contempt of court?*

[PROSECUTOR]: Objection; hearsay.

THE COURT: Overruled.

[DOE]: *I'm not sure.* He just, I gave my mom the paper, yeah, with the, I have to go to school and, *I think he told me that if I don't go to school, then I'll be put in DH[⁶] or something like that.*

. . . .

Q: *Did you understand what a contempt order is?*

A: *No.*

(Emphases added.)

Despite the foregoing testimony, the court found that Doe "had actual proper notice" of the order and it "was satisfied by proof beyond a reasonable doubt that the material allegations on the petition for criminal contempt of court [had] been proven[.]" The court then adjudicated Doe a law violator pursuant to HRS § 571–11(1). The court ordered that Doe be "detained in Hale Ho'omalu forthwith" until July 5, 1998, after which she was to be released to her mother and stepfather.

**B.**

On July 16, 1998, Doe filed a motion for reconsideration of the law violator adjudication. In a declaration attached to the mo-

tion, counsel for Doe argued two grounds—first, there was a lack of proof to show Doe understood the court rules, and second, the court's adjudication was contrary to public policy:

c. At no time did the prosecution seek to enter [the court rules] into evidence. The Court took judicial notice of its records and files. Even if judicial notice was taken of [the court rules], this does not establish evidence of those rules or of [Doe's] receipt of those rules. [Doe] enjoys the full array of constitutional protections available to any [m]inor in the State of Hawaii. *No evidence introduced at trial establishes what [the court rules] were, or that [Doe] had received and understood those rules.* The Court should reconsider its adjudication of Minor because a trial court cannot take judicial notice of an essential element of a criminal offense. . . .

d. *The Court has essentially "bootstrapped" a[p]rotective [s]upervision [v]iolation into a criminal offense* through the filing of a contempt petition, which is against public policy, and should not be tolerated by the courts. . . .

(Emphases added.)

At the August 10, 1998 hearing on the motion for reconsideration, the court granted the motion only for the purpose of ordering the State to "prepare written [f]indings of particular circumstances to be attached to judgment order . . ." as required by HRS § 710–1077(5). At the conclusion of the hearing, counsel for Doe indicated her intent to appeal the court's adjudication of Doe as a law violator. Doe filed a notice of appeal on September 2, 1998.

**III.**

HRS § 710–1077(1)(g) states in part that "[a] person commits the offense of criminal contempt of court if . . . [t]he person knowingly disobeys or resists the process, injunction, or other mandate of a court[.]"

The findings of fact (findings) were filed on September 4, 1998, and state in relevant part:

**6.** "DH" apparently refers to the Detention Home    referred to in HRS § 571–33 (1993).

3. Court Officer [Hussey] of the Juvenile Intake Branch of the Family Court of the First Circuit testified to the following: On January 14, 1998, she, as [Doe's] probation officer, met with [Doe] following [Doe's] appearance in court. During the meeting, Hussey went over each of [the court rules] with [Doe] including the rule which required [Doe] to attend her classes at school regularly unless excused by the school or the court. [Doe] stated she understood [the court rules] and acknowledged such by signing [the court rules] at the bottom of the form.

4. The [c]ourt heard the testimony of [Doe's] special motivation teacher at Waianae Intermediate School, [Wagatsuma,] who stated she was [Doe's] teacher during the 1997–98 school year. Wagatsuma testified [Doe's] classes were strictly in her classroom. Wagatsuma further indicated [Doe] was absent from school for ten days during the period between February 3rd, 1998 and March 2nd, 1998.

5. [Tanji] testified he was the Vice Principal at Waianae Intermediate School. He also indicated he worked directly under the Principal as a Vice Principal and was therefore an authorized representative of Waianae Intermediate School. Lastly, he stated Waianae Intermediate School did not give [Doe] permission to be absent from school at anytime during the period between February 3rd, 1998 and March 2nd, 1998.

6. After the State rested [Doe] testified to the following: She was in court on January 14th, 1998 when [the court] issued [the protective supervision order] and [the court rules]. [Doe] remembered [the court] ordering her to go to school and stating if she failed to do so she would go to the detention home. *However she did not know what "contempt of court" meant. There furthermore was no attorney present at the hearing on January 14th, 1998.*

(Emphasis added.) No written conclusions of law were filed.

We temporarily remanded the case on September 1, 1999, for entry of conclusions of law. The court made the following conclusions of law, which were filed on September 3, 1999.

1. [Doe] knowingly disobeyed a valid and legal mandate of the court, to wit, the [protective supervision o]rder and [the court rules] issued by [the court] on January 14th, 1998 and January 22nd, 1998 by failing to attend school for ten days at Waianae Intermediate School between February 3rd, 1998 and March 2nd, 1998

2. The State of Hawaii proved beyond a reasonable doubt all of the elements of [c]ontempt of [c]ourt.

## IV.

On appeal, Doe contends that the findings failed to set forth the particular circumstances of Doe's adjudication under HRS § 710-1077(5), that she was not given notice of the nature and consequences of a contempt of court conviction, and that the "bootstrapping" of status offenses into law violations is contrary to the provisions of HRS chapter 571.

The State contends that the findings were sufficient, that the court is authorized by HRS § 571–8.5(6) (1993) to hold a minor in contempt, that the practice of "bootstrapping" has been affirmed in other states, and that Doe understood the sanction to be imposed if she continued to be truant.

## V.

■ In regard to Doe's first argument, HRS § 710–1077(5) requires that "[w]henever any person is convicted of criminal contempt of court or sentenced therefor, the particular circumstances of the offense shall be fully set forth in the judgment and in the order or warrant of commitment." This provision is strictly construed. *State v. Hicks*, 71 Haw. 564, 566, 798 P.2d 906, 907 (1990) (holding that HRS § 710–1077(5) requires the trial court set out written findings of the particular circumstances of contempt); *State v. Lloyd*, 88 Hawai'i 188, 189, 964 P.2d 642, 643 (1998) (concluding that the trial court erred because under HRS § 710–1077(5), it "fail[ed] to include any factual specifications in its ... judgment").

We conclude that the particular circumstances were adequately set out in the court's decision. We observe, however, that the court's six findings are simply a recitation of the testimony given by the witnesses at the contempt trial. A "finding of fact" is a "determination of fact by the court, averred by one party and denied by the other and founded on evidence in case." *Black's Law Dictionary* 632 (6th ed.1990). "A common definition of 'finding of fact' [includes] ... '[a] conclusion by way of reasonable inference from the evidence.'" *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 164, 109 S.Ct. 439, 102 L.Ed.2d 445 (1988) (quoting *Black's Law Dictionary* 569 (5th ed.1979)). These definitions suggest that a finding of fact necessitates some form of action by a court; that is, that it decide the effect of the evidence presented.

▮ Findings should "disclose to the reviewing court the steps by which the trial court reached its ultimate conclusion on each factual issue." 9A C. Wright & A. Miller, *Federal Practice and Procedure: Civil* § 2579, at 539 (2d ed.1995) (footnote omitted). They should be "the independent product of the court's own thinking," *id.* at 536, and should be " 'sufficiently comprehensive and pertinent to the issue [involved] to form a basis for the decision and [be] ... supported by the evidence.'" *Shannon v. Murphy*, 49 Haw. 661, 668, 426 P.2d 816, 820 (1967) (quoting 5 *Moore's Federal Practice* 2656). Hence, the court should in each finding indicate its ultimate determination of the factual issue in question.

## VI.

We next address Doe's contention that she was not informed of the nature of contempt and the consequences of being held in contempt of court.

During the August 10, 1998 reconsideration hearing, Doe's counsel argued that Doe "didn't have any notice of [sic] that any future violation of protective supervision will ultimately result in her being a law violator.". Counsel stated further:

> [I]t is our argument and remains our argument that a child who has been told that [in] a protective supervision violation, the maximum penalty is placement outside of the home and has been told this continually and then all of a sudden being told that now the maximum penalty is commitment to [Hawaii Youth Correctional Facility (HYCF)] until age nineteen [sic] and being placed on probation [is wrong].

In short, counsel argues that Doe had no notice at the status hearing that continued truancy could subject her to the risk of probation with incarceration or commitment to the HYCF.[7]

The court's exact admonition to Doe at the status hearing is not a part of the record and therefore may be gleaned only from Doe's testimony at the July 1, 1998 contempt trial.[8] At the contempt trial, Doe maintained that she did not understand the concept of contempt, and that she was not aware of the significance of a contempt order. She stated that the court did not tell her "what contempt of court was and if [she] violate[d] it what would happen." Her testimony reveals at best, only a minimal understanding of the court's explanation of contempt, to the effect that if she did not "go to school, then [she would] be put in DH or *something like that.*" (Emphasis added.) We conclude the record is inadequate to demonstrate that Doe was fully advised of the nature of a contempt charge, of the resulting conversion of her status to that of a law violator, and of the consequences of being adjudicated a law violator.

---

**7.** The Hawai'i Youth Correctional Facility provides for "incarceration, punishment and institutional care and services ... [of] children committed by the courts to the State." *See* HRS § 352–2.1 (1993).

**8.** The transcript of the status hearing was not designated as part of the record on appeal. Furthermore, although the protective supervision order states that both probation officer Michelle Hussey and Doe's mother were present at the status hearing, neither Hussey nor Doe's mother were questioned about her knowledge of the court's explanation of contempt.

Neither the record nor Doe's testimony reveals that the court adequately explained the nature of a contempt of court charge and the consequences which could flow from the violation. Nor does Doe's testimony indicate a cogent understanding of the potential consequences of a contempt adjudication and the corresponding elevation from status to law violator. Moreover, the court's conclusion that the minor knowingly disobeyed a mandate of law is inconsistent with the finding that she did not know what contempt of court meant.

The court rules and the DOE rules that Doe acknowledged and signed, did not inform her of the nature of a contempt charge. None of the documents issued as a result of the status hearing referred to the statutory provisions defining contempt of court. None of these documents explained the effect of a contempt adjudication on Doe's protective supervision status. In fact, the DOE rules said nothing of her potential adjudication as a law violator for breach of the rules, but misleadingly indicated that "fail[ure] to obey" the rules "may" result in "community service" and "major violations may result in detention." None of these documents explained the "law violator" status and the consequences of being adjudicated a law violator. Indeed, the only reference to "law violator" in the court rules advised Doe that she would be subject to law violator status if she failed "to obey the laws," not the court's order. None of the witnesses testified that Doe was advised of the nature of contempt or the adverse consequences of being adjudged a law violator.

### VII.

■ Because Doe was not given sufficient notice of the nature of contempt and the consequences thereof, she could not be subjected to a charge or finding of knowing disobedience of a mandate of the court under HRS § 710–1077(1)(g).

The Supreme Court of Massachusetts has recognized that "[c]riminal contempt for violation of an order *requires* a *clear and unequivocal order, evidence that the defendant knew of the order and its repercussions*, and intentional disobedience of the order." *Com-*

*monwealth v. Florence F.*, 429 Mass. 523, 709 N.E.2d 418, 420 (1999) (emphases added, citation omitted) (concluding nevertheless that the juvenile court did not have the power to place a minor in contempt for failure to comply with conditions of custody because there was no valid order upon which contempt could be based).

Such notice is required even by those states that have chosen to punish the violation of status offender orders as contempt. In *In re Darlene C.*, 278 S.C. 664, 301 S.E.2d 136 (1983), the Supreme Court of South Carolina held that a minor who had appeared in court fourteen times during a two-and-a-half year time period for the status offenses of truancy and running away was properly held in contempt. *See id.* at 137. However, that court found certain factors must exist "[b]efore a chronic status offender is placed in a secure facility," such as showing that all less restrictive alternatives have failed in the past and that "the record *must reflect the juvenile understood that disobedience would result in incarceration* in a secure facility." *Id.* at 138 (emphasis added).

The Supreme Court of Minnesota also determined that a minor must be notified of the consequences of a contempt action, stating in *State ex rel. L.E.A. v. Hammergren*, 294 N.W.2d 705 (Minn.1980), that "[i]n order for the juvenile court to find a 'wilful failure to comply' which warrants a holding of contempt, the record from the previous hearing[s] must show that the child understood that disobedience would result in incarceration in a secure facility." *Id.* at 707. *Cf. L.A.M. v. State*, 547 P.2d 827, 831 (Alaska 1976) (holding that to be held in contempt for violating a court order, a minor must, *inter alia*, have notice of a valid order directing the minor to "do or refrain from doing something").

■ We find these cases supportive of the fundamental proposition that a court must give a minor prior notice of the nature and the consequences of criminal contempt before he or she may be considered for adjudication of contempt of court for violation of a court order, and we so hold. Since such notice was

lacking here, Doe should not have been found in violation of the court rules.

## VIII.

■ We believe as a *general* matter, that the family court may hold a minor in contempt of court.[9] An express contempt power is vested in the circuit and district family courts in HRS § 571–81 which relates to adults and states in part that "[a]ny adult who wilfully violates, neglects, or refuses to obey or perform any lawful order of the court may be proceeded against for contempt of court." HRS § 571–8.5 relates to district family courts and expressly states that judges of these courts "may" "[e]nforce decisions and judgments; and punish contempts according to law[,]" HRS § 571–8.5(6), and "make . . . such judgments, decrees, orders, and mandates . . . as may be necessary to carry into full effect the powers . . . given to them by law or for the promotion of justice[.]" HRS § 571–8.5(10). A general power to punish contempts is thus stated in HRS § 571–8.5(6). In the same vein, HRS § 571–8.5(10) would permit the family court to impose contempt sanctions in aid of its powers. We assume that circuit family courts are vested with the same general power as the family district courts under the jurisdiction assigned generally to circuit courts under HRS § 603–21.9 (1993), and that the enumeration of powers in HRS § 571–8.5 as to district courts is intended to complement their otherwise limited jurisdiction.

## IX.

However, the issue in the instant case is the more precise one of whether the family court in a protective supervision case may enforce its order through the use of a contempt charge, and thereby render the minor's status into one of a law violator.

## X.

### A.

When HRS § 571–11 is construed *in pari materia* with the remaining sections of the relevant provision, HRS Chapter 571, it is evident that the family court is vested with exclusive jurisdiction over both a minor classified as a law violator and one denominated as a status offender, *see* HRS § 571–11, but that different treatment is accorded to each.

Unlike law violators, status offenders may not be placed in secure shelter facilities if informal adjustment is chosen in place of formal court action. HRS § 571–31.5. After being taken into custody, a law violator may be "securely detained in a certified police station cellblock or community correctional center." HRS § 571–32(d). No·such authorization is given in the case of a status offender. Under HRS § 571–2, the definition section of HRS chapter 571, a status offender is described as "any child coming within the family court's jurisdiction under section 571–11(2)(B), (C), or (D)[ ] [and *s]uch child is distinguished from . . . a law violator under section 571–11(1) who comes into the family court upon allegations such person has committed an act which would constitute a crime if committed by an adult[.]* " (Emphases added.) Read in conjunction with HRS § 571–11, the definition of "status offender" clarifies that only a status offender (as opposed to a law violator) may be placed

---

**9.** "There are two types of criminal contempt in Hawaii—direct 'summary contempt' and indirect 'constructive contempt.' " *Evans v. Takao,* 74 Haw. 267, 279, 842 P.2d 255, 261 (1992) (citing *Gabriel v. Gabriel,* 7 Haw.App. 95, 99, 746 P.2d 574, 577 (1987) (internal citations omitted)).

Direct summary criminal contempt occurs when "the offense [is] committed in the immediate view and presence of the court, or under such circumstances that the court has knowledge of all the facts constituting the offense[.]" HRS § 710–1077(3)(a) (1993). "Other contumacious offenses are deemed indirect constructive criminal contempt." *Evans,* 74 Haw. at 279, 842 P.2d at 261 (citations omitted).

The following instances have been characterized as indirect contempt: failure of an attorney to appear at a hearing without prior notice to the court, *see State v. Ryan,* 59 Haw. 425, 426, 583 P.2d 329, 331 (1978) and tardiness in appearing in court. *See Wong v. Frank,* 9 Haw.App. 249, 256, 833 P.2d 85, 90 (1992). However, a defendant's failure to appear in state court because of a conflicting federal court hearing, of which defendant informed her attorney, was not held to be constructive contempt. *See State v. Brown,* 70 Haw. 459, 465, 776 P.2d 1182, 1186 (1989) ("[T]he defendant's disregard of the mandate was not a deliberate failure to appear as directed.")

in "protective supervision." This is because " '[p]rotective supervision' means a legal status created by court order in proceedings *not involving violations of law* [.]" HRS § 571–2 (emphasis added).

Once a child is determined to fall within one of the aforesaid classifications, the family court is mandated to adopt discrete dispositions as to a minor adjudicated a law violator and as to a minor found to be a status offender:

> When a minor is found by the court to come within section 571–11, the court shall so decree . . . [and u]pon the decree of the court, by order duly entered, *shall proceed as follows:*
>
> (1) As to a child adjudicated under section 571–11(1):
>
> (A) The court may place the child on probation:
>
> (i) In the child's own home; or
>
> (ii) In the custody of a suitable person or facility elsewhere. . . .
>
> When conditions of probation include incarceration in a youth correctional facility, the incarceration shall be for a term not to exceed one year[.] . . .
>
> (B) The court may vest legal custody of the child . . . in a Hawaii youth correctional facility, in a local public agency or institution, or in any private institution or agency . . .; or in a private home. . . .
>
> (C) The court may fine the child for a violation which would be theft . . . [or] require the child to perform public services in lieu of the fine;
>
> (2) *As to a child adjudicated under section 571–11(2):*
>
> (A) *The court may place the child under protective supervision,* as hereinabove defined, in the child's own home, or in the custody of a suitable person or agency elsewhere, upon conditions determined by the court; *or*
>
> (B) *The court may vest legal custody of the child,* after prior consultation with the agency or institution, in a local governmental agency or institution licensed or approved by the State to care for children[.]

HRS § 571–48 (emphases added). As indicated above, a child adjudicated a status offender under § 571–11(2) cannot be subjected to probation and accompanying incarceration thereunder, or to commitment to the HYCF. The only dispositions for status offenders permitted under HRS § 571–48 are protective supervision or legal custody in any agency or institution.

As set forth *infra,* following the filing of a petition or a motion for revocation of protective supervision, a status offender may not be held in a secured detention in excess of twenty-four hours, excluding holidays and weekends, unless the child violated a valid court order as defined in the JJDPA. HRS § 571–32(e). Thus, under HRS § 571–48(2)(B), the court is apparently limited in status offender cases to placing the child under protective supervision *or* vesting legal custody in an approved entity. Probation and incarceration as a condition thereof, as well as commitment to a correctional facility, are not permitted as authorized dispositions.

We observe, additionally, that HRS § 571–50 further provides that a decree issued under HRS § 571–48 may be modified at any time, and in the event of a "violation of the terms of supervision," the family court may convene "a hearing on a charge" to that effect. Construing HRS §§ 571–48 and –50 together, we believe that, at least as to violations of protective supervision orders,[10] HRS § 571–50 directs that a decree may be modified on the institution of "a *charge* of [the] violation of the terms of [protective] supervision." (Emphasis added.)

#### B.

Doe was adjudicated under HRS § 571–11(2). Under that adjudication, the court is allowed two options—protective supervision or legal custody. Nowhere is the court au-

---

The circumstances in this case would constitute an indirect contempt.

**10.** For all intents and purposes, we believe the court rules and DOE rules attached to a protec-

tive supervision order are a part of that order, and the reference to protective supervision order in the text *infra* would subsume such rules.

thorized to adjudicate a status offender who violates the terms of a protective supervision order, a law violator. Adjudication as a law violator subjects a minor to the risk of probationary incarceration and HYCF commitment. Under HRS § 571-48, those dispositions are prescribed only for law violators.

### C.

■■ In light of the distinction drawn in HRS chapter 571 between status offenders and law violators, we conclude that the conversion of a status offender into a law violator because of the violation of a protective supervision order is inimical to the classification framework adopted in HRS chapter 571. The conduct punished in this case as contempt is exactly the same conduct which rendered Doe a status offender in the first place—her failure to attend school. In imposing a criminal contempt sanction, the court in essence imposed punitive measures for conduct which was not criminal. We conclude that this course is devoid of logic, consistency, and rationality, and is at war with the evident policy in the HRS chapter 571 provisions discussed herein.

The court's approach would also be inconsistent with the modifiable nature of protective supervision orders which permit adjustments to changing circumstances. We believe the appropriate disposition for a status offender violation is as stated in HRS § 571-50, "a charge" to that effect, and not a contempt proceeding under HRS § 710-1077. To decide otherwise would be to blur the clear line drawn between status offenders and law violators, and to a substantial degree, put every status offender at risk of becoming a law violator with all the

concomitant adverse consequences attached to the latter status.

■ Of course, a minor who engages in conduct which *independent* of the violation of protective supervision order constitutes contempt, would be subject to HRS § 571-11(1) jurisdiction of the court, so long as the notice requirements we have described in Part VI, if applicable, have been satisfied.

### XI.

The fact that a status offender should not be converted into a law violator, however, does not mean that a status offender cannot be subjected to secured detention. Under HRS chapter 571, the relationship between status and confinement is at once intertwined and separate. As discussed herein, while a status offender is not subject to the full panoply of secured detention and incarceration available for law violators, a status offender may be subjected, as the law is written, to temporary detention under HRS §§ 571-31 and -32(d), or to extended detention under the "valid court order" provision in HRS § 571-32(e).

Initially we observe that a minor may be taken into custody on reasonable grounds to believe that the minor comes within the status offender jurisdiction of the family court or has violated a court order of protective supervision.[11] Such a minor may be placed in a detention facility for the child's immediate welfare[12] or on the ground that the minor "is subject to detention for violations of a court order of . . . protective supervision."[13] The definition of "detention" in HRS § 571-2 reiterates that status offenders

---

11. HRS § 571-31 (1993) states, in part:

    **Taking children into custody; release; notice.** (a) A child may be *taken into custody by any police officer without* order of the judge when there are reasonable grounds to believe that a child *comes within section 571-11(1) or (2), or* by any police or probation officer when there *are reasonable grounds to believe that the child has violated a court order of probation or protective supervision.*
    (Emphases added.)
    HRS § 571-33 directs that a detention home be established for the temporary detention of minors.

12. "Immediate welfare" is defined in HRS § 571-31.1(b).

13. HRS § 571-31 states, in part:

    (b) When an officer or other person takes a child into custody the parents, guardian, or legal custodian shall be notified immediately. The child shall be . . . (3) *taken directly to a detention facility, if the child's immediate welfare* or the protection of the community requires it, or the child *is subject to detention for violation of a court order* of . . . *protective supervision.*
    (Emphases added.)

may be placed in secured facilities for violation of a protective supervision order.

"Detention" means the temporary care of children who require custody in physically secure facilities:

. . . .

    (4) Because of violation of a family court order of . . . protective supervision.

If a status offender is not released to the offender's parent or diverted from formal court proceedings, he or she may be held in a "place of detention or shelter" pending a court hearing.[14] No minor, however, may be held in "a detention facility or shelter" for more than twenty-four hours, excluding weekends and holidays, unless a petition has been filed, a motion for revocation of protective supervision has been filed or after a hearing, the court orders otherwise. HRS § 571–32(d).[15] The same restriction applies following the filing of the aforesaid petition or motion unless the court orders otherwise, after a hearing.[16]

If there is probable cause to believe the minor is a law violator, the minor "may be securely detained." [17] However, a status offender may not be securely detained in a detention facility for more than twenty-four hours unless the offender has been adjudicated for violating "a valid court order" as described under the JJDPA:

**14.** HRS § 571–32(a) (1993) states in part:
    **Detention; shelter; release; notice.** (a) If a child who is believed to come within section 571–11(1) or (2) is not released as provided in section 571–31 and is not deemed suitable for diversion, the child shall be taken without unnecessary delay to the court or to the place of detention or shelter designated by the court.

**15.** HRS § 571–32(d) (1993) states that *"[n]o child shall be held in a detention facility* for juveniles or shelter *longer than twenty-four hours,* excluding weekends and holidays, *unless a petition . . . or motion for revocation of protective supervision has been filed, or unless the judge orders otherwise after a court hearing."* (Emphases added.)

**16.** We are not faced with the question of whether the HRS § 571–32(e) "valid court order" exception discussed in the text would apply to the detention provisions in HRS §§ 571–31 or –32(d), and do not decide it.

**17.** HRS § 571–32(e) (1993) states, in part:

If there is probable cause to believe that the child comes within section 571–11(2), . . . the child may be held, following a court hearing, in a shelter *but may not be securely detained in a detention facility for juveniles for longer than twenty-four hours,* excluding weekend and holidays, *unless the child . . . is allegedly in or has already been adjudicated for a violation of a valid court order,* as *provided under the federal Juvenile Justice and Delinquency Prevention Act of 1974, as amended.*

HRS § 571–32(e) (emphases added). It appears that following her contempt trial, Doe was detained in a detention facility for more than twenty-four hours, excluding holidays and weekends. As we have decided, Doe's status offender status should not have been altered. The question then is whether ascribing status offender standing to her, Doe's detention was imposed pursuant to a "valid court order" as defined under the JJDPA. Doe argues that her detention was in violation of this provision because the January 14, 1998 protective supervision order was not a valid court order as so defined.

## XII.

The JJDPA, codified at 42 U.S.C. § 5633 *et seq.* (1995), allowed for incentive grants to states upon a state's adoption of measures for the deinstitutionalization of status offenders.[18] In 1993, HRS § 571–32(e) was amend-

    No child may be held after the filing of a petition or motion, as specified in subsection (d) of this section, unless an order for continued detention or shelter has been made by a judge after a court hearing. If there is probable cause to believe that the child comes within section 571–11(1), the child may be securely detained following a court hearing[.]

**18.** " 'Bootstrapping' is a term used to describe the use of the contempt power by juvenile courts to elevate a status offender into a juvenile delinquent." Jan C. Costello & Nancy L. Worthington, *Incarcerating Status Offenders: Attempts to Circumvent the Juvenile Justice and Delinquency Prevention Act,* 16 Harv. C.R.-C.L. L.Rev. 41, 58 (1981) [hereinafter *"Incarcerating Status Offenders "*]. Bootstrapping is easily illustrated by the facts of Doe's case: a minor is truant from school and is adjudicated a status offender; when the minor continues to be truant despite the court order to attend school, he or she is held in criminal contempt of court and is classified as a delinquent for violating the court order.

ed to "bring [s]tate law related to the treatment of status offenders and juvenile law violators into compliance with the [JJDPA]." Stand. Comm. Rep. No. 837, in 1993 Senate Journal, at 1086. Almost $1,000,000.00 in federal funds were being withheld from Hawai'i due to non-compliance with the JJDPA. Stand. Comm. Rep. No. 1145, in 1993 House Journal, at 1458. In order to receive federal funds, the legislature determined that "the first step [was] to pass legislation that *prohibits the incarceration of children accused or adjudicated of committing non-criminal offenses* and limits the use of jails and lockup facilities for juveniles accused of crime." *Id.* (emphasis added.) Consequently, the legislature amended HRS § 571–32(e), as reflected in its present form.

## XIII.

The JJDPA provides that

[i]n order to receive formula grants under this part, a [s]tate shall submit a plan ... [which] shall

...

(12)(A) provide within three years after submission of the initial plan that *juveniles who are charged with or who have committed offenses that would not be criminal if committed by an adult or offenses (other than an offense that constitutes a violation of a valid court or-*

der ...) shall not be placed in secure detention facilities or secure correctional facilities[.]

42 U.S.C. § 5633(a)(12)(A) (emphasis added). While the obvious intent of the JJDPA was to discourage the commitment of status offenders to secured facilities, the parenthetical exception for cases involving violation of a valid court order appears to work at cross purposes to that objective. However, the requirements of a valid court order are stringent, and thus, an obstacle to the facile exercise of a court's incarcerating power.

### A.

The JJDPA defines "valid court order" as a court order given to a minor

(A) who was brought before the court and made subject to such order;

(B) *who received, before the issuance of such order, the full due process rights* guaranteed to such juvenile by the Constitution of the United States;

(C) *with respect to whom an appropriate public agency (other than a court or law enforcement agency), before the issuance of such order-*

(i) reviewed the behavior of such juvenile and the circumstances under which such juvenile was brought before the court and made subject to such order;

---

Most states define a delinquent as a minor who has committed a crime, and therefore, "the issuance of a criminal contempt citation can change a status offender who has violated a court order into a juvenile delinquent." *Id.* The change in status thus "allows the judge to avoid the disposition limits set for [a child in need of services] to those sanctions available for delinquents, including secure detention." Maggie L. Hughey, *Holding a Child in Contempt*, 46 Duke L.J. 353, 378 (1996).

On one hand, bootstrapping has been defended as "a technique that must be used in order to force status offenders to cooperate with the court and accept treatment." *Incarcerating Status Offenders, supra*, 16 Harv. C.R.–C.L. L.Rev. at 59. But bootstrapping has also been criticized as an "unconscionable technique probably born of frustration, used to thwart the federal and state public policy regarding status offenders." Harry J. Rothgerber, Jr., *The Bootstrapping of Status Offenders: A Vicious Practice*, 1–JUL Ky. Children's Rts. J. 1, 7 (1992). The practice allows the minor to be placed in secure detention, even if the act which initially violated the court order

was only a status offense and not a violation of the criminal law. *Incarcerating Status Offenders, supra*, 16 Harv. C.R.–C.L. L.Rev. at 59.

Courts from other states have upheld the use of the contempt power for such purposes both with and without certain limitations. *See, e.g., In re Michael G.*, 44 Cal.3d 283, 243 Cal.Rptr. 224, 747 P.2d 1152 (1988); *In re Darlene C.*, 278 S.C. 664, 301 S.E.2d 136 (1983); *In re D.L.D.*, 110 Wis.2d 168, 327 N.W.2d 682 (1983); *State v. Norlund*, 31 Wash.App. 725, 644 P.2d 724 (1982); *State ex rel. L.E.A. v. Hammergren*, 294 N.W.2d 705 (Minn.1980).

Other states have rejected this practice outright. *See, e.g., W.M. v. State*, 437 N.E.2d 1028 (Ind.App.1982); *In re Tasseing H.*, 281 Pa.Super. 400, 422 A.2d 530 (1980); *In re Bellanger*, 357 So.2d 634 (La.App.1978). *See also Holding a Child in Contempt, supra*, 46 Duke L.J. at 366–81 (discussing state statutes relevant to a court's contempt power and the case law arising from bootstrapping).

Not surprisingly, the outcome of each case depends to a large extent on the factual circumstances involved, and the relevant statutory scheme of the state.

(ii) determined the reasons for the behavior that caused such juvenile to be brought before the court and made subject to such order;

(iii) determined that all dispositions (including treatment), other than placement in a secure detention facility or a secure correctional facility, have been exhausted or are clearly inappropriate; and

(iv) *submitted to the court a written report* stating the results of the review conducted under clause (i) and the determinations made under clauses (ii) and (iii)[.]

42 U.S.C. § 5603(16) (emphases added). In short, the JJDPA requires that 1) the minor be brought before a court with proper jurisdiction; 2) the minor receive "due process"; and 3) a written report be submitted to the court before issuance of the court order.

### B.

Title 28, Code of Federal Regulations (C.F.R.) § 31.300 *et seq.* (1999), "sets forth specific JJDP Act requirements for application and receipt of formula grants" under the JJDPA. In relevant part, 28 C.F.R. § 31.303(f)(3) states that an order is a "valid court order" if

all of the following conditions [are] present prior to secure incarceration:

(i) The juvenile must have been brought into a court of competent jurisdiction and made subject to an order issued pursuant to proper authority. The order must be one which regulates future conduct of the juvenile. *Prior to issuance of the order, the juvenile must have received the full due process rights* guaranteed by the Constitution of the United States.

. . . .

(iii) *The juvenile in question must have received adequate and fair warning of the consequences of violation of the order at the time it was issued* and such warning must be provided to the juvenile and to the juvenile's attorney and/or legal guardian in writing *and be reflected in the court record* and proceedings.

(iv) All judicial proceedings related to an alleged violation of a valid court order must be held before a court of competent jurisdiction. A juvenile accused of violating a valid court order *may be held in secure detention beyond the 24–hour grace period permitted for a noncriminal juvenile offender* . . . for protective purposes as prescribed by State law, or to assure the juvenile's appearance at the violation hearing, as provided by State law, *if there has been a judicial determination based on a hearing during the 24–hour grace period that there is probable cause to believe the juvenile violated the court order.* In such case the juvenile *may be held* pending a violation hearing *for such period of time as is provided by State law, but in no event* should detention prior to a violation hearing *exceed 72 hours exclusive of nonjudicial days.* A juvenile alleged or found in a violation hearing to have violated a[v]alid [c]ourt [o]rder may be held only in a secure juvenile detention or correctional facility, and not in an adult jail or lockup.

(v) *Prior to and during the violation hearing the following full due process rights* must be provided:

. . .

(C) The right to an explanation of the nature and consequences of the proceeding;

(D) *The right to legal counsel,* and the right to have such counsel appointed by the court if indigent[.] [19]

. . .

(vi) *In entering any order that directs* or authorizes *the placement of a status offender in a secure facility, the judge presiding over* . . . *[a] violation hearing must determine that all the elements of a valid court order* (paragraphs (f)(3)(i), (ii)

---

19. The other due process rights are:

(E) The right to confront witnesses;

(F) The right to present witnesses;

(G) The right to have a transcript or record of the proceedings; and

(H) The right of appeal to an appropriate court.

28 C.F.R. § 31.303(3)(v) (1999).

and (iii) of this section) and the applicable due process rights (paragraph (f)(3)(v) of this section) *were afforded the juvenile and, in the case of a violation hearing, the judge must obtain and review a written report that: reviews* the behavior of the juvenile and the circumstances under which the juvenile was brought before the court and made subject to such order; determines the reasons for the juvenile's behavior; *and determines whether all dispositions other than secure confinement have been exhausted or are clearly inappropriate. This report must be prepared and submitted by an appropriate public agency (other than a court or law enforcement agency).*

(Emphases added.)

We examine certain elements of a "valid court order" as they apply to this case.

## XIV.

### A.

■ First, there is no dispute that the court had jurisdiction in the instant case pursuant to HRS § 571–11, to render the January 14, 1998 protective supervision order. Second, it appears that the order "regulate[d] future conduct of the juvenile" pursuant to 28 C.F.R. § 31.303(f)(3)(i), because it prescribed prospective requirements for school attendance and instructed the DOE to request a contempt petition in the event Doe failed to abide by its terms.

In other respects, however, the protective supervision order failed or may have failed to meet the JJDPA definition of "valid court order."

### B.

The due process rights which must be provided to a minor prior to and during the status hearing includes "the right to legal counsel and the right to have such counsel appointed by the court if indigent[.]" 28 C.F.R. § 31.303(3)(v)(D).

Doe related during the contempt trial that only she and her mother were present during the January 14, 1998 status hearing. While there is a "Rights Form" in the "social rec-

ord," it is unfiled and dated the same day as the hearing. It is not clear, therefore, whether Doe was afforded her due process right to an attorney in a reasonable time *prior* to the status hearing as is required by 28 C.F.R. § 31.303(3)(v)(D).

### C.

Doe should also have received "adequate and fair warning of the consequences of the violation of the order at the time it was issued[.]" 28 C.F.R. § 31.303(3)(iii). As we have pointed out, the record does not reflect Doe was adequately informed about the consequences of violating the protective supervision order at the time it was issued. At the trial, Doe related that the court did not explain the concept of contempt and did not describe the consequences, which eventually befell her.

### D.

The contempt trial also lacked a determination by the court that the elements of a valid court order had been satisfied. Nothing in the record indicates that the judge presiding over the contempt trial (the apparent "violation hearing" under 28 C.F.R. § 31.303(3)) found that Doe had, at the status hearing, been offered counsel and received prior "adequate and fair warning of the consequences of violation of the order at the time it was issued ... and [that this was] reflected in the court record[.]" 28 C.F.R. § 31.303(f)(3)(iii).

### E.

It must also be noted that the written report mandated by the JJDPA must determine "that all dispositions (including treatment), other than placement in a secure detention facility or a secure correctional facility, have been exhausted or are clearly inappropriate[.]" 42 U.S.C. § 5603(16)(C)(iii). Title 28 of the C.F.R. reiterates that the written report must set forth the reasons for the minor's behavior and render a determination that "all dispositions other than secure confinement have been exhausted or are clearly inappropriate." 28 C.F.R. § 31.303(f)(3)(vi). The re-

port must be submitted prior to the issuance of a valid court order. 42 U.S.C. § 5603(16)(iv).

State's Exhibit 1 dated December 3, 1997 and entitled "Pre-court Interventions," was submitted by the DOE and received in evidence at the status hearing. It sets out Wai'anae School's Evaluation and Plan and recommends "sanctions against the student for every day truant from school, e.g. community service." It does not make the determination required under 28 C.F.R. § 131.303(f)(3)(vi).

The psychological evaluation ordered by the court was prepared by a graduate student in clinical psychology and a clinical psychologist of the Family Court Liaison Branch. If intended to be the JJDPA written report, it runs afoul of the JJDPA prohibition against "a court or law enforcement agency" conducting and submitting the written report. 42 U.S.C. § 5603(16)(C). Also, the psychological evaluation is dated almost a month *after* the protective supervision order issued and was not completed prior to that order. The psychological report recommends various treatments but does not recommend secured detention. Like the DOE document, the psychological evaluation makes no 28 C.F.R. § 31.303(f)(3)(vi) determination.

Such a report must also be made available for the violation hearing. 28 C.F.R. § 31.303(3)(vi). This requirement similarly was not satisfied.

## XV.

We conclude the January 14, 1998 protective supervision order did not fulfill the requirements of a valid court order as defined by the JJDPA. Upon being adjudicated a law violator, Doe was confined in Hale Ho'omalu from July 1, 1998 until July 5, 1998, for a total of five days. Excluding holidays and weekends as required by HRS § 571–32(e), two days counted toward her sentence.[20] Thus, Doe's confinement exceeded the twenty-four-hour maximum allowed by HRS § 571–32(e) for status offenders by approximately thirty-six hours. Because the commitment was not imposed pursuant to a

valid court order, the court's order violated HRS § 571–32(e).

## XVI.

For the foregoing reasons, the court's findings, order and decree of July 1, 1998, and the August 10, 1998 order denying Doe's motion for reconsideration adjudicating Doe a law violator, are reversed.

Concurring and Dissenting Opinion of BURNS, C.J.

I concur with the majority's opinion that the family court erred when it adjudicated Minor Appellant Jane Doe (Doe) as a law violator for contempt of court for knowingly violating the protective supervision order. The State failed to show that Doe was adequately advised of the possibility of being found in contempt of court and of all of the possible sentences that could be imposed if and when she knowingly violated the protective supervision order.

I disagree with the majority's opinion that the family court is not authorized to convict a minor of contempt of court for knowingly violating a protective supervision order. Hawai'i Revised Statutes (HRS) § 571–8.5(a)(6) (Supp.1998) states in relevant part that "[t]he district family judges may: ... [e]nforce decrees and judgments and punish contempts according to law[.]" HRS § 710–1077(1)(g) (1993) states in relevant part that "[a] person commits the offense of criminal contempt of court if: ... [t]he person knowingly disobeys or resists the process, injunction, or other mandate of a court[.]" It follows that a minor/status offender who knowingly disobeys a protective supervision order may be convicted as a law violator for criminal contempt of court. If this was not true, most protective supervision orders would have no more impact than if they were issued by the minor's parents, teachers, or social workers. Minors who are not impressed by orders issued by the minor's parents, teachers, or social workers are not impressed by court

---

20. We exclude only Saturday and Sunday in computing Doe's confinement period.

orders that cannot be enforced by contempt convictions.